**BLUM et al. v. FLEISHHACKER et al.**

No. 3800–S.

District Court, N. D. California, S. D.

Dec. 6, 1937.

Hanna & Morton and Harold C. Morton, all of Los Angeles, Cal., and Courtney L. Moore, of San Francisco, Cal., for plaintiffs.

John Francis Neylan, Bartley C. Crum, William F. Humphrey, ·Robert M. Searls, McKinstry & Haber-Peirce Coombes, and George Moncharsh, all of San Francisco, Cal., for defendants.

ST. SURE, District Judge.

Plaintiffs,· citizens and residents of the republic of France, as stockholders of the Anglo-California Bank of San Francisco, a national banking association (hereinafter referred to as the Anglo Bank), brought this suit to recover for the bank secret profits received by its president, Herbert Fleishhacker, in a business venture with L. B. Barde and J. N. Barde. Plaintiffs are members of the Lazard and Cahn families, owners of the international banking house of Lazard Freres et Cie. The Lazard family was one of the founders of what is now the Anglo Bank. After the Lazards withdrew from the banking business in California, they were represented here by the Anglo Bank. Defendants Victor Klinker, Harry Thompson, and Palo Alto Stock Farms, Inc., sued with Herbert Fleishhacker and the Anglo Bank, were "dummies" holding stock for Herbert Fleishhacker in the Barde Steel Products. Company, a corporation, the outgrowth of the partnership agreement between the Bardes and Herbert Fleishhacker involved herein.

At all times mentioned· in the bill of complaint Herbert Fleishhacker was the president and chief executive officer of the Anglo Bank, receiving an annual salary of $50,000.

In 1919 the United States Shipping Board Emergency Fleet Corporation called for bids for the purchase of surplus steel of the value of about $40,000,000 owned by the government. L. B. Barde and J. N. Barde of M. Barde & Sons, Inc., believing there would be a profit in the purchase and resale of such a large quantity of steel, wished to bid. Approximately $1,000,000 would be needed "to launch the enterprise." A bidder required $250,000 to qualify his bid. Of the $1,000,000 needed the sum of

$400,000 (including the $250,000 for qualification) would have to be deposited with the government as a guaranty fund, and in addition $500,000 in cash or surety bond for faithful performance. The remaining $100,000 would be for operating capital of the "enterprise."

M. Barde & Sons, Inc., had theretofore had an account and credit with the Anglo Bank, and once borrowed from it $111,000 on unsecured notes. The relations between the Bardes and Herbert Fleishhacker were friendly, and L. B. Barde had married Fleishhacker's cousin.

The Bardes were financially unable to promote the steel deal alone. L. B. Barde broached the matter to Herbert Fleishhacker and invited him to join in the proposed enterprise. Fleishhacker agreed to become an equal partner (on a basis of one-half to him and one-half to the two Bardes) if investigation convinced him the deal would be profitable. Up to this time it had not been suggested to Herbert Fleishhacker that it would be necessary for the Bardes to borrow money from the bank. "They agreed to put up a half million dollars if necessary and required," testified Herbert Fleishhacker, "and I agreed to put up $500,000 either in cash or in security, or a bond, if the Shipping Board would accept a bond." L. B. Barde went East to "make a thorough investigation" and report thereon to Herbert Fleishhacker, who also made an independent investigation.

After full investigation Herbert Fleishhacker agreed to become a partner in the deal. "When it came to putting up the money," testified Herbert Fleishhacker, "they asked me if they could borrow, if the firm of M. Barde & Sons could borrow some money from the bank." Fleishhacker further testified that he told the Bardes some time prior to December 16th that $250,000 could be borrowed. This $250,000 was required for deposit with the bid for the steel to be purchased. On December 16, 1919, J. N. Barde wrote to Herbert Fleishhacker as follows:

"In accordance with your wishes regarding Eastern Deal, writer is enclosing note in the sum of $250,000.00 payable on demand and has instructed Mr. L. B. Barde, now in New York, to see the Guarantee Trust Company and do likewise.

"Hoping we have complied satisfactorily to your wishes in the matter, we are,

"Very truly yours."

This initial $250,000 was procured from the funds of the Anglo Bank on December 19, 1919, on the above-mentioned note, dated December 16, 1919, executed by M. Barde & Sons, Inc., indorsed by J. N. Barde. In addition to the note, the Bardes delivered to the Anglo Bank as collateral security for the loan United States Liberty bonds of the value of $200,000 or more. Herbert Fleishhacker knew the money was being borrowed for the purpose of qualifying the bid. He recommended to the bank the granting of the loan. He knew that the money was sent to L. B. Barde in the East and used as a deposit on the bid for the steel. The Anglo parted with the money on December 19, 1919, and on that date J. N. Barde wired Herbert Fleishhacker from Portland, Or., as follows:

"Herbert Fleishhacker

"President Anglo and London Paris National Bank or St. Francis Hotel San Francisco Calif

"Just received following wire from L. B. Barde Pennsylvania Hotel New York Wire received Arrangements suggested satisfactory to me Arrange with Herbert for additional credit here of two hundred fifty thousand covering one hundred fifty thousand balance payable on signing of contract and one hundred thousand dollar working capital Tell Herbert I have asked Parker to act as his representative on trade stop Writer will be with you Sunday morning and advise with you and listen to your suggestions relative to handling this deal

"Jack"

J. N. Barde came to San Francisco on Sunday, December 21, 1919, pursuant to the telegram, and had an interview with Herbert Fleishhacker. On that date notes were signed to procure an additional $250,-000, one note to the Anglo Bank for $75,-000 (on a printed form of an Oakland bank with the name of the Anglo inserted as payee), and one note to the Central Bank of Oakland for $175,000. Both notes were signed M. Barde & Sons, Inc., per J. N. Barde and indorsed by J. N. Barde. Herbert Fleishhacker guaranteed the note to the Oakland bank. This $250,000 was advanced on December 22d and was deposited on December 23d in New York to the credit of L. B. Barde. Thereafter, on December 24, 1919, formal approval of the loans granted by the Anglo was made by the finance committee of the bank of which Mortimer Fleishhacker, brother of Her-

bert, was chairman. The other members of the committee were Herbert Fleishhacker, J. J. Mack, and Sigmund Stern, the last two named since deceased. The report was signed by Mortimer Fleishhacker, J. J. Mack, and Sigmund Stern. From the records of the bank there was produced at the trial a financial statement of M. Barde & Sons, Inc., for the purpose of securing credit. It is dated December 23, 1919, and shows the total assets of the firm to be $750,000 with no liabilities stated. No showing was made that the loans were ever approved by the board of directors (seventeen in number) of the bank.

A corporation named the Barde Steel Products Company was organized on January 6, 1920, to manage the enterprise. On January 8, 1920, the directors of the company authorized the issuance to L. B. Barde or his nominees of all its stock, $500,000 par value preferred and 10,000 shares of common stock, no par value, in return for the successful bid, the $250,000 deposited at the time of the bid, and the other $250,000 then on deposit in New York. The capital stock was issued in accordance with a resolution, one-half to nominees or dummies of Herbert Fleishhacker to hold for his benefit, the other half to the Bardes. No cash was paid to the company for its stock. No contributions of money were made to the company by either the Bardes or Herbert Fleishhacker. The capital stock of the company was paid for by the moneys borrowed to finance the enterprise. Herbert Fleishhacker did not appear on the books of the company as a stockholder, but actually got one-half of the stock in the name of dummies selected by him for that purpose. At the time the deal was entered into it was agreed he should be paid a salary as one of the principals.

On January 9, 1920, a contract was entered into by Barde Steel Products Company to purchase from the United States Shipping Board Emergency Fleet Corporation the steel which had been bid on. This contract was secured by $400,000 guaranty fund deposited at the time of the contract (being $400,000 of the $500,000 raised on the loans above referred to) and by a bond in the amount of $500,000 Herbert Fleishhacker being indemnitor to the bonding company.

The deal was successful and profitable. The three notes aggregating $500,000 were paid by the Barde Steel Products Company from its funds, payment being completed April 24, 1920. Payment was not made by M. Barde & Sons, Inc., or from the personal funds of the Bardes or Herbert Fleishhacker. By a letter Herbert Fleishhacker acknowledged payment by Barde Steel Products Company of "your [Barde Steel Products Company's] indebtedness with the Anglo." The company subsequently borrowed on unsecured notes large sums from the Anglo Bank aggregating at one time $118,000.

Herbert Fleishhacker received profits from the deal in the form of salary $75,000 and dividends $73,125. He sold his interest in the Barde Steel Products Company and another deal with the Bardes for $200,000. A large part of this sum was attributable to the fact that the Bardes had extracted more than their share of the profits of the steel venture, and by this restitution they were accounting directly to Herbert Fleishhacker for his share of the profits.

In 1931 Etienne Lang, a member of the Lazard family and related to all of the plaintiffs herein, began an investigation of matters in which the Anglo Bank and Herbert Fleishhacker had acted as agent for the Lazards. The bill alleges, which allegation is sustained by the evidence, that the plaintiffs had no knowledge of the facts constituting the cause of action until about the year 1933. The investigation continued until October 29, 1934. On the last-mentioned date said Lang, as agent for plaintiff stockholders, caused to be delivered to the chairman of the board of directors of the Anglo Bank a demand that suit be forthwith instituted on behalf of the bank to recover all profits received by Herbert Fleishhacker in his transactions with the Bardes. The board of directors passed a resolution refusing to take action. This suit was filed on December 5, 1934.

The facts narrated above relate to the main issue in the case, and are indisputable. The serious question presented for decision is whether they show that Herbert Fleishhacker violated his trust to the Anglo Bank and its stockholders.

Herbert Fleishhacker was a director and the president and chief executive officer of the Anglo Bank. He occupied a fiduciary or quasi trust relation towards the bank and its stockholders collectively. It is thoroughly well settled that he could not, either directly or indirectly, in his dealings on behalf of the bank with others,

or in any other transaction in which he was under a duty to guard the interests of the bank, make any profit, or acquire any personal benefit or advantage, not also enjoyed by the other stockholders, and, if he did so, he may be compelled to account therefor to the bank in an appropriate action. 3 Fletcher Cyclopedia Corporations (Permanent Ed.) § 884, p. 208.

In regard to trustees in general, Perry, in his work on Trusts, states: "They cannot use the trust property, nor their relation to it, for their own personal advantage. All the power and influence which the possession of the trust fund gives must be used for the advantage and profit of the beneficial owners, and not for the personal gain and emolument of the trustee. No other rule would be safe; nor would it be possible for courts to apply any other rule, as between trustee and cestui que trust." 1 Perry on Trusts (6th Ed.) § 427, p. 686.

In respect to agents in general, Mechem states the rule to be "all profits made and advantage gained by the agent in the execution of the agency belong to the principal. And it matters not whether such profit or advantage be the result of the performance or of the violation of the duty of the agent if it be the fruit of the agency. * * * All profits and every advantage beyond lawful compensation, made by the agent in the business, or by dealing or speculating with the effects of his principal, though in violation of his duty as agent, and though the loss, if one had occurred, would have fallen on the agent, will, wherever they can be regarded as the fruit or the outgrowth of the agency, be deemed to have been acquired for the benefit of the principal." 1 Mechem on Agency (2d Ed.) §§ 1224, 1225, pp. 894, 895.

■ A director or other corporation officer "will not be permitted 'to derive any personal profit or advantage by reason of his position, distinct from his coshareholders,'" and "the law has ceased to look at the mere form of the device employed," but instead "now pierces through the surface and seizes upon the evils which lie within." Porter v. Healy, 244 Pa. 427, 91 A. 428, 432.

It is contended that defendants violated no fiduciary duty; that there is no evidence whatsoever that Herbert Fleishhacker's participation in the steel venture constituted a violation of any statute; or that his participation in the steel venture was the consideration for the two loans

made by the bank to M. Barde & Sons, Inc. It is further contended that Herbert Fleishhacker acted in the highest good faith for the protection and benefit of the Anglo, and that the two loans were highly desirable to the bank; that there was no secrecy in Fleishhacker's participation in the steel venture.

Counsel for defendants argue "that if by any fanciful construction it be concluded that Herbert Fleishhacker was indirectly a borrower of the bank's funds, such borrowing would not have been unlawful"; that "at the time of the events in the instant case no statute expressly or impliedly declared unlawful the conduct of Herbert Fleishhacker which is now questioned by plaintiffs"; that it was not until 1933 that the national banking act was amended by Congress to prohibit loans to executive officers of a bank. 12 U.S.C.A. § 375a. And therefore, because Congress did not prohibit loans to executive officers of banks until 1933, there was nothing wrongful about the acts of Herbert Fleishhacker in 1919.

The law will not permit an officer of a corporation to make a private profit for himself in the discharge of his official duties. Farmers' & Merchants' Bank of Los Angeles v. Downey, 53 Cal. 466, 31 Am. Rep. 62. In the Downey Case two persons by the names of Lindenfeldt and Melchert had entered into a contract to buy a block of land for $16,000 and had paid $1,000 on the purchase price. They had an agreement to resell the same property on terms for $46,000, and they needed $15,000 to pay their vendor in order to finance the project. One Downey (a former Governor of California) and one Childs were directors of the plaintiff bank, Downey being president thereof. Downey caused the bank to loan the $15,000 on a note executed by Lindenfeldt and Melchert secured by a mortgage on the property, and at the same time Downey and Childs entered into a written agreement with Lindenfeldt and Melchert, which recited the purchase agreement, the resale agreement, the execution of the note for $15,000, and the mortgage securing the same to the bank, which documents were incorporated in the agreement by reference and deposited with the bank. An examination of the record in the Downey Case shows the situation there to be similar to that in the case at bar. In the Downey Case the bank president incurred liability in the deal and invested his own funds, and expressly guaranteed the

532

bank loan which financed the venture. The bank was fully secured. Nevertheless Downey was required to account for the profits made by him. In the instant case Herbert Fleishhacker personally guaranteed the payment of $175,000 to the Central Bank of Oakland and also signed an indemnity agreement to a bonding company in the sum of $500,000 in conformity with the contract with the United States Shipping Board. The loans from the Anglo to M. Barde & Sons, Inc., were fully protected. In the Downey Case the court said:

"The controversy between the parties involves the right to the one-sixth of the profits of the land transaction already referred to. These profits constitute the bonus which the defendant attempted to secure to himself to the exclusion of the other stockholders, in making the loan of the money of the bank.

"Upon well-settled principles governing Courts of Equity, the defendant cannot be permitted to retain these profits for himself. They constitute part of the consideration which the borrowers paid or agreed to pay in obtaining the loan, and are as clearly the property of the corporation as is the interest accrued and stipulated to be paid on the face of the note itself. In making the loan the defendant was acting as a director—the president—of the corporation. * * * He was its trustee. 'The officers and directors of a corporate body * * * are trustees of the stockholders, and cannot, without being guilty of fraud, secure to themselves advantages not common to the latter.' (Bigelow on Fraud, p. 248, and cases cited in note.) * * *

"The law will not permit them to make a private profit for themselves in the discharge of their official duties; and, as observed by the Court of Appeals of the State of New York, in Bain v. Brown, 56 N.Y. [285] 288, 'When agents and others, acting in a fiduciary capacity, understand that these rules will be rigidly enforced, even without proof of actual fraud, the honest will keep clear of all dealings falling within their prohibition, and those dishonestly inclined will conclude that it is useless to exercise their wits in contrivances to evade it.'"

In the Downey Case the president of the bank agreed to furnish the money required upon the expressed condition that he should become personally interested to the extent of one-sixth of the profits of the land transaction, while here there was no expressed condition for participation in the profits. This presents the question, do the facts here justify an inference that a part of the consideration for the loans to the Bardes was an agreement that Fleishhacker should participate in the profits of a deal financed from the funds of the Anglo Bank?

■ The rule upon which the Downey Case is decided, the rule fixing the duties and responsibilities of a fiduciary or agent, as stated in the above quotations from Fletcher, Perry, and Mechem, sustained by decisions too numerous to cite, is not based upon any statute. The rule is as old as the doctrine of fiduciary relations and the principles of agency, and needs not the sanction of statute to make it binding and enforceable.

However, if statute law were needed, the national bank act at the time of this transaction provided: "Any officer * * of a member bank who * * * receives or consents or agrees to receive any * * * thing of value from any person * * * for procuring or endeavoring to procure for such person * * * or for any other person * * * any loan from * * * such member bank" shall be punished, etc. 12 U.S.C.A. § 595.

In McCabe v. Sacchetti, 73 Pa.Super. 500, suit was brought upon a promissory note. The defendant sought to prove "that plaintiff was a director in a national bank, that defendant desired to borrow a sum of money larger than he would be able to secure on his own credit from the bank, that he agreed with the plaintiff to pay him the sum of five hundred dollars if he, the plaintiff, would endorse the note of the defendant, procure its discount at the bank, and renew the same from time to time until it was paid. It was, as he alleges, in pursuance of this contract that he signed and delivered to the plaintiff the note in suit." The trial court denied the defense. In reversing the case the appellate court cited the statute above mentioned, and said: "It ought not to be necessary to more than state that reasons of the highest public policy demand the careful enforcement of such a statute. The confidence which the public should feel in the integrity and soundness of these financial institutions is an asset of the greatest value to the banks themselves and greatly promotes the feeling of quiet security without which the transactions of the business

world cannot be successfully carried on. That confidence lives and flourishes only * * * by such conduct of its financial affairs by its officials as to keep them above suspicion."

 Herbert Fleishhacker financed the deal in which he became a partner with the Bardes. None of the parties personally contributed any money, but upon the recommendation of Fleishhacker the Anglo Bank loaned the money which made the venture possible. The Barde Steel Products Company was organized to conduct the business. Fleishhacker received one-half of the capital stock without paying a dollar of his money for it. The business was profitable, Fleishhacker's share thereof amounting to about $300,000. Under these circumstances may it not be said that Fleishhacker, president of a national bank, received a thing of value, to wit, capital stock of the company, for procuring from his bank a loan to launch the venture?

It is next argued that Herbert Fleishhacker did not appropriate "any business which rightfully belonged to the Anglo Bank." The contention that profits are not recoverable from an officer "where the lines of endeavor in which the money was made are ultra vires, i. e., beyond the powers of the corporation," has been universally rejected. 3 Fletcher Cyclopedia Corporations (Permanent Ed.) § 890, p. 223; Memphis & Arkansas River Packet Co. v. Agnew, 132 Tenn. 265, 177 S.W. 949, L.R. A.1916A, 640.

The law will not allow private profit from a trust, and will not listen to any proof of honest intent, or proof "that the dealing was for the best interest of the beneficiary, but will set the transaction aside at the mere option of the cestui que trust." Wickersham v. Crittenden, 93 Cal. 17, 29, 28 P. 788, 790.

It is also urged that there was no secrecy in Herbert Fleishhacker's participation in the steel venture. Admittedly some of the bank officials knew that Herbert Fleishhacker was interested in a deal with the Bardes. They received Herbert Fleishhacker's recommendation that the loan be made. As we have seen, Mortimer Fleishhacker, brother of Herbert, was chairman of the finance committee that approved the loan. Mortimer Fleishhacker testified as follows:

"Q. Did you consider—let me ask you this, did you consider it detrimental to the loan or that it weakened the loan that Herbert Fleishhacker was in this enterprise? A. I considered it a strengthening factor, the fact that Herbert Fleishhacker was in on the loan, because we had faith in his judgment. We knew that it added financial standing and we had absolute faith in his integrity, so his connection with this transaction decidedly strengthened it."

In this connection it may be observed that, while the officers of the Anglo knew of the transaction, it was not at that time known to plaintiff stockholders. Besides the question of secrecy is immaterial. There was no secrecy in Farmers' & Merchants' Bank v. Downey, supra. And in Goodell v. Verdugo Canon Water Co., 138 Cal. 308, 314, 71 P. 354, 356, it is said: "Appellant contends that, because the action of the directors was open, and not secret, the rule does not apply that a trustee is prohibited from making a profit out of his trust relation. Mr. Thompson is quoted as saying that the rule 'means that he must not make a secret profit out of it.' 3 Thomp. Corp., § 4022. The publicity alone of an illegal and unauthorized act of the directors of a corporation does not make it legal or valid. Shareholders may, after a full, fair, and complete disclosure of all the circumstances attending a transaction which will benefit the directors who make it, agree that such directors shall retain the special benefit that may accrue from the transaction, and will not afterwards be heard to claim that this benefit shall be surrendered to them as a corporation, as Mr. Thompson suggests. Section 4025. But we do not understand the author to hold that trustees may validate an illegal act by simply doing it openly, and certainly such contention generally applied would be subversive of the very objects for which the rule is established."

"Suppose," argue counsel for defendants, "that in the year 1919 Herbert Fleishhacker had borrowed $325,000 from the Anglo Bank and, on his sole account, had used the money in a steel venture which ultimately proved profitable. The transaction would have been lawful." That would depend upon the facts and circumstances of the case. "Every tub must stand upon its own bottom." It is true that "except where expressly forbidden by statute or where the loan is in excess of the limit fixed by statute * * * a director or other corporate officer may borrow money from the corporation, without any necessary imputation of fraud, provided there is no breach

of trust in making the loan. However, if corporate officers become borrowers from the corporation, their transactions for their own benefit are closely scrutinized." 3 Fletcher, supra, § 955, p. 334, 335.

"In the absence of legislative prohibition, there is no rule of the common law which prevents the making a loan or discount to a director any more than to any other person. Only, a director applying for such a loan must not vote or officially aid in the discussion concerning its allowance. The same principles of law will be applied to this as to other loans, but they will be rigidly enforced, and the proceedings will be severely scrutinized. He must behave himself strictly like any other outside customer of the corporation. He must cause his request to be acted upon by the majority of his codirectors, strictly exclusive of himself. It is probable that any circumstance of impropriety or suspicion attendant upon the fact of his making the application at all, or upon the manner of making it or procuring its acceptance, would be construed with a degree of stringency, as against him, greater than would be exercised towards an ordinary outside borrower." Morse on Banks and Banking (6th Ed.) vol. 1, pp. 320, 321.

Even if Herbert Fleishhacker personally might have lawfully borrowed money from his bank in 1919 and loaned it to the Bardes, under all other facts, circumstances, and conditions here shown, undoubtedly his acts would still come within the inhibition of the law governing trustees and agents.

Upon the main issue, the conclusion seems inevitable that Herbert Fleishhacker violated his trust to the Anglo Bank and its stockholders. "That a director of a joint-stock corporation occupies one of those fiduciary relations where his dealings with the subject-matter of his trust or agency, and with the beneficiary or party whose interest is confided to his care, is viewed with jealousy by the courts, and may be set aside on slight grounds, is a doctrine founded on the soundest morality, and which has received the clearest recognition in this court and in others." Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 588, 589, 23 L.Ed. 328. Such an officer "is obligated, by reason of his mere occupancy of the office, to act in all matters affecting the corporation and its stockholders solely with an eye to their best interests, unhampered by any pecuniary interest of his own." Western States Life Ins. Co. v. Lockwood, 166 Cal. 185, 190, 135 P. 496, 498. "In equity all money over and above his salary which he receives by reason of such position, is so much paid for the office itself, which office is the property of the principal." 2 Yale Law Journal 228, 229.

Defendants further contend that plaintiffs have no right to maintain this suit for the benefit of the bank, and that the suit was not so instituted; that the board of directors properly refused to take action upon the demand of Etienne Lang; that there was inequitable delay in the institution of the suit.

■ The suit is brought by citizens and residents of France who are stockholders of the bank. The law recognizes the right of these stockholders to sue. There is no evidence showing any improper motive in bringing the suit. Where the suing stockholder is acting for himself and not in the interests of a stranger to the corporation his motives are immaterial. Johnson v. King-Richardson Co. (C.C.A.) 36 F.2d 675, 677, 67 A.L.R. 1465.

In accordance with the requirement of Equity Rule 27 (28 U.S.C.A. following section 723), before instituting suit plaintiffs, through their agent Etienne Lang, made written demand upon the board of directors in which they set forth the gravamen of the charges against the president of the bank, Herbert Fleishhacker. In acknowledging receipt of this demand the chairman of the board stated that he would communicate with Etienne Lang later. No such communication was ever sent or received. No request was made that Lang appear and offer proof of the charges made. The board merely passed a resolution that no action be taken. It is permissible to conclude from these facts, as said by plaintiffs' counsel, "that the directors were either under the domination of Fleishhacker or saw fit to accept his denial of wrongdoing." Thereafter the directors made common cause with Herbert Fleishhacker in seeking to justify his acts. Under these circumstances the plaintiffs had the right to bring suit.

■ The evidence shows that discovery of the facts upon which the charges of fraud are based was made in 1933. The suit was filed on December 5, 1934, within the statutory period. The claim of laches is without merit. Franklin v. Mortgage Guaranty & Security Co. (C.C.A.) 57 F.2d 834, 838; Victor Oil Co. v. Drum, 184 Cal.

226, 242, 193 P. 243; Kelley v. Boettcher (C.C.A.) 85 F. 55, 62.

After a consideration of the whole case, I find that Herbert Fleishhacker violated his trust to the bank and its stockholders; that a part of the consideration for the loans of the Anglo Bank to the Bardes was the participation by Herbert Fleishhacker with them in the profits of the steel deal; that Herbert Fleishhacker made a private profit for himself in the discharge of his official duties.

Judgment for plaintiffs as prayed for in the bill of complaint.