**FLEISHHACKER et al. v. BLUM et al.**

No. 9021.

Circuit Court of Appeals, Ninth Circuit.

Feb. 7, 1940.

Rehearing Denied April 3, 1940.

544

MATHEWS, Circuit Judge, dissenting.

———◆———

Herman Phleger, Brobeck, Phleger & Harrison, McKinstry & Haber, Peirce Coombes, William F. Humphrey, and Robert M. Searls, all of San Francisco, Cal. (John Ford Baecher, of San Francisco, Cal., of counsel), for appellants Fleishhacker, Thompson, Palo Alto Stock Farms, Inc., and the Anglo-California Nat. Bank.

Edwin V. McKenzie and J. H. Sapiro, both of San Francisco, Cal., for Klinker.

Hanna & Morton, Harold C. Morton, and Leon Brown, all of Los Angeles, Cal., and Courtney L. Moore, of San Francisco, Cal., for appellees.

Before MATHEWS, STEPHENS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

Appellees,[1] stockholders of the Anglo-California National Bank of San Francisco (herein called the Bank), sued to recover for the Bank profits or bonuses alleged to have been received by appellant Herbert Fleishhacker, its president, as consideration for his causing the Bank to make certain loans to be used in a business venture in which he was interested. Appellants Thompson, Klinker, and Palo Alto Stock Farms, Inc., were nominees of Fleishhacker in holding stock evidencing his interest, issued by a corporation organized to carry on the enterprise. The suit being a derivative one, the Bank also was joined as a defendant.

The trial court found in favor of the Bank and entered a decree against Fleishhacker and his nominees, jointly and severally, in the sum of $736,485.57.[2] D.C., 21 F.Supp. 527.

Following were the facts as found by the trial court: In 1919 the United States Shipping Board Emergency Fleet Corporation called for bids on an intended sale of a large quantity of surplus steel owned by the government. J. N. Barde and L. B. Barde, of M. Barde & Sons, Inc., desired to bid with the view of reselling the steel at a profit. They invited Herbert Fleishhacker to join in the proposed enterprise. The Bardes and Fleishhacker conducted independent investigations and decided that the venture would be a profitable one. Thereupon, about December 1, 1919, the Bardes and Fleishhacker agreed to join in the enterprise on the basis that Fleishhacker was to be an equal partner with the two Bardes, namely, a one-half interest to Fleishhacker and one-half to the Bardes.

After having agreed to become an equal partner, Fleishhacker was advised by the Bardes that $250,000 was required to launch the enterprise, such amount being necessary to qualify the bid, and that, if the bid was successful, an additional $250,000 would be needed. Of the latter sum $150,000 would be added to the original deposit to form a guaranty fund of $400,000 on the purchase price; and the remaining $100,000 would be set aside as working capital.

Fleishhacker agreed to finance the venture, and caused the Bank to advance, on December 19, 1919, the sum of $250,000, on the demand note of M. Barde & Sons, Inc., endorsed by J. N. Barde. Fleishhacker knew the money was to be used as a deposit on the steel bid. Three days later Fleishhacker caused the Bank to advance a

---

[1] Appellees are citizens and residents of the Republic of France. They own 1554 shares of stock out of 770,000 outstanding.

[2] This figure represents $348,125 received by Fleishhacker as bonuses, and $388,360.57 interest.

further sum of $75,000, on a demand note executed and endorsed as the first one had been    This sum, together with $175,000 borrowed at the same time from the Central Bank of Oakland, constituted the additional $250,000 needed to complete the total capital outlay. The sum procured from the Oakland bank was evidenced by a demand note executed by M. Barde & Sons, Inc., and endorsed by J. N. Barde. The note was guaranteed by Fleishhacker.

The loans were approved by a loan committee of the Bank on the recommendations of Fleishhacker. They were secured by Liberty Bonds of the value of about $200,000, furnished by the Bardes.

After the steel bid had been accepted, and on January 6, 1920, the Bardes organized the Barde Steel Products Corporation, a Delaware corporation, as an entity for carrying on the enterprise. This corporation had an authorized capital stock of 15,000 shares, consisting of 5,000 shares of preferred having a par value of $100 per share, and 10,000 common with no par value.

On January 7, 1920, the Bardes caused the Corporation to adopt a resolution providing that all of this stock should be issued to L. B. Barde in exchange for the bid and the $500,000 cash capital. No further contribution of money was made to the Corporation by the Bardes or by Fleishhacker. Half of the stock was actually issued to the Bardes and the other half to the nominees of Fleishhacker.[3]

All of the loans above referred to were at all times regarded as the indebtedness of the Barde Steel Products Corporation and were repaid, on or before April 24, 1920, out of the funds of the Corporation. Subsequent to their repayment, and during the years 1920, 1921 and 1922, Fleishhacker caused the Bank to loan the Corporation additional sums, aggregating at one time as much as $118,000, for use in the enterprise in which he owned a half interest.

On January 9, 1920, a contract was entered into between the Barde Steel Products Corporation and the United States Shipping Board Emergency Fleet Corporation. A surety bond for faithful performance of the contract, in the amount of $500,000, was furnished by Fleishhacker, who also signed an indemnity agreement in favor of the company writing the bond.

The steel venture was successful, and Fleishhacker received the following pecuniary benefits: On September 20, 1920, he was paid $50,000 as salary by the Barde Steel Products Corporation, notwithstanding the fact that he was not employed by it. On March 16, 1921, he received an additional $25,000 as salary. Between January 1, 1920, and March 15, 1923, he received $73,125 in dividends on the stock held by his nominees. On or about March 22, 1923, he sold his interest in the Corporation to the Bardes for $200,000.

The court found that part of the consideration for the loans to the Bardes was an agreement between them and Fleishhacker that the latter should participate in the profits of the enterprise to be financed by the funds of the Bank; that Fleishhacker received one-half of the capital stock of the Barde Steel Products Corporation without paying a dollar of his own money for it; and that, as president of the Bank, he received this stock in consideration of his procuring the loans with which to launch the venture.

The court concluded that Fleishhacker, in accepting the various sums as salary and dividends, and for his interest in the venture, violated his trust as president of the Bank and should be held accountable, together with his nominees, for such sums, with interest.

1. It is a settled principle—applied in its full rigor in California, Farmers' & Merchants' Bank v. Downey, 53 Cal. 466, 31 Am.Rep. 62—that a bank officer who receives a bonus or other consideration for procuring a loan of the bank's funds commits a breach of trust, and that the

---

[3] Fleishhacker's stock was distributed as follows:
Preferred:
  Certificate No. 1—800 shares to Victor Klinker.
  Certificate No. 2—800 shares to Palo Alto Stock Farms, Inc. (owned by Fleishhacker).
  Certificate No. 3—800 shares to Harry T. Thompson.
  Certificate No. 4—100 shares to Charles G. Hoffman.
Common:
  Certificate No. 1—1600 shares to Victor Klinker.
  Certificate No. 2—1600 shares to Palo Alto Stock Farms, Inc.
  Certificate No. 3—1600 shares to Harry T. Thompson.
  Certificate No. 4—200 shares to Charles G. Hoffman.

consideration so paid belongs to the bank and may be recovered by it.[4] See, also, Restatement, Trusts, § 170, Comment n, § 206, Comment k; Restatement, Restitution, § 197, Comment a. The bonus may be recovered even though the bank has suffered no damage (Restatement, Restitution, § 197, Comment c), and even though the officer may have acted in good faith (Restatement, Restitution, § 197, Comment a; Farmers' & Merchants' Bank v. Downey, supra; Bain v. Brown, 56 N.Y. 285, 288).

Conceding that the rule is basic, counsel for appellants confine themselves largely to an attack upon the findings last summarized. They contend that there was no proof of an agreement or condition whereby Fleishhacker received his interest in the venture as consideration, in whole or in part, for procuring the bank loans. They urge that Fleishhacker did not know until after his deal with the Bardes had been made that it was necessary for the latter to borrow, and indeed they claim the findings so indicate; hence, in getting the loans for the Bardes Fleishhacker went beyond his obligation and his services were purely gratuitous.

The argument is based upon what we regard as an unwarranted interpretation of the findings as a whole, and it is not borne out by the evidence. While there was no direct proof of an agreement or condition of the kind stated, the existence of one is inferable from the facts and circumstances in evidence. Prior to the time it became necessary to raise the money there had been no definite contract finally determinative of the rights and liabilities of the parties in the venture. All that seems to have been clearly decided was that Fleishhacker was to go in with the Bardes upon a general fifty-fifty basis. The details were uncertain. Necessarily, the entire matter remained at large until the terms of the Shipping Board were finally ascertained and the parties were faced with the specific problem of meeting them. One of these problems involved the financing of the Bardes.

It seems plain that Fleishhacker's interest in the venture was proffered him, in substantial measure at any rate, in exchange for anticipated services in the procurement of loans. Fleishhacker must be deemed to have acceded to this condition when his tentative understanding with the Bardes ripened into a definite working contract. His own testimony indicates that he did not regard the deal with the Bardes as finally closed until he had agreed to raise the needed money. He said in response to an interrogatory, that a part of the consideration furnished by him in exchange for the stock of the Corporation was his guaranty of the Barde note to the Central Bank of Oakland. His procurement of the loans from his own bank would seem no less to have entered into the picture as part of the consideration. The transactions are of one piece.

J. N. Barde testified that in discussing with Fleishhacker the matter of raising the $500,000, the latter stated "right off" that he would "attend to it and get it"; and that he, Barde, did not specify where the money was to come from—all he wanted was the money.[5] The very fact that Fleishhacker performed as expected, when considered in connection with the other circumstances, is in itself evidence of an agreement on his part that needed loans would be forthcoming.

While Fleishhacker arranged for and

---

[4] Such conduct is denounced by a federal statute as a misdemeanor (12 U.S.C.A. § 595); and by a state statute as a felony (Cal.Penal Code § 561).

[5] A letter of this witness transmitting to Fleishhacker the first note for $250,000, dated Dec. 16, 1919, in tone and substance supports his testimony: "*In accordance with your wishes* regarding Eastern deal, writer is enclosing a note in the sum of $250,000 payable on demand, and has instructed Mr. L. B. Barde, now in New York, to see the Guaranty Trust Company and do likewise. *Hoping we have complied satisfactorily to your wishes* in the matter, we are, Very truly yours," (Emphasis supplied.) A telegram from the witness to Fleishhacker, dated Dec. 12, 1919, reads as follows: "Herbert Fleishhacker President Anglo and London Paris National Bank or St Francis Hotel San Francisco Calif: Just received following wire from L B Barde Pennsylvania Hotel New York Wire received arrangements suggested satisfactory to me Arrange with Herbert for additional credit here of two hundred fifty thousand covering one hundred fifty thousand balance payable on signing of contract and one hundred thousand dollar working capital Tell Herbert I have asked Parker to act as his representative on trade Writer will be with you Sunday morning and advise with you and listen to your suggestions relative to handling this deal. Jack."

guaranteed a faithful performance bond of $500,000 for the Corporation, between him and any possible liability to the surety company lay a cash deposit of at least $400,000. He personally put no money into the enterprise and took small financial risk. There are compelling grounds for the inference that an important part of the consideration which he undertook to furnish for his half interest in this promising deal was his services in the procurement of the needed loans.

■ Whether we have discussed them in detail or not, we have carefully considered the distinctions drawn by appellants in the endeavor to separate the Bank transaction from its matrix. The analysis of able counsel makes the case appear a close one in its purely legalistic aspects, as cases of this character frequently are; for often a thin line may serve to divide dealings unexceptionable in their nature from those which equity condemns. But the essential verities of the situation cannot be explained away, and when all is said there remains an ineradicable conviction that Fleishhacker used his position as president of the Bank as a means of securing emoluments personal to himself. The Bank paid him a salary [6] and had the right to command his undivided fealty in all matters pertaining to the lending of its funds. In the discharge of his high trust the law holds a responsible agent such as Fleishhacker was to standards of probity and fidelity more lofty than those of "the market place". These high standards this court is not disposed to whittle down.

■ 2. The court did not err in allowing interest on the various sums received by Fleishhacker. The amounts received by him as salary and dividends belonged, in equity, to the Bank. Upon these funds the Bank is entitled to interest. It is likewise entitled to interest on the proceeds received by Fleishhacker from the sale of the stock. See Cal.Civ.Code, § 2237; Restatement, Trusts, § 208, Comment f. To deny interest on these sums would be to permit Fleishhacker to profit from the use of moneys belonging to the Bank.

■ 3. There is no evidence that appellants Thompson, Klinker, or the Palo Alto Stock Farms, Inc. knew the details of the arrangement between Fleishhacker and the Bardes. They knew, of course, that he was interested in the steel venture and that he was the beneficial owner of half the stock in the Corporation, for this stock had been issued in their names as nominees of Fleishhacker. But there is no showing of knowledge on their part that Fleishhacker had obtained his interest in consideration of his causing the Bank to make the Barde loans, and no evidence from which their knowledge of this essential fact can be inferred.

The decree as against them must be reversed.

■ 4. We think appellees have complied with the requirements of Equity Rule 27, 28 U.S.C.A. following section 723, relating to stockholders' bills.[7] The rule provides, in part, that the complaint "must * * * set forth with particularity the efforts of the plaintiff to secure such action as he desires on the part of the managing directors or trustees, and, if necessary, of the shareholders, and the cause of his failure to obtain such action, or the reasons for not making such effort."

The complaint alleged, in detail, a demand upon the board of directors to bring the action, and their refusal to bring it. The allegations in this respect were admitted, and were found by the court to be true. The complaint did not allege, in so many words, that the board's refusal to sue constituted a breach of trust, or that it was wrongful or improper. Nor did the court make any specific finding to that effect; but it did find that "after the filing of the present action the directors of the defendant bank made common cause with Herbert Fleishhacker and the other defendants in seeking to justify the acts complained of in the complaint and defeat recovery herein." It is obvious from the findings as a whole, as well as from the opinion, that the court looked upon the board's refusal to sue as amounting to a breach of trust.

■ The question whether such refusal was wrongful depends, in any event, upon all the circumstances of the case. Hawes v. Contra Costa Water Co., 104 U.S. 450, 26 L.Ed. 827; Dodge v. Woolsey, 18 How. 331, 15 L.Ed. 401; Corbus v. Alaska Treadwell Gold Mining Co., 187 U.S. 455, 23 S.Ct. 157, 47 L.Ed. 256; Fletcher Cyc. Corporations, § 5822, pp. 124–126. And, in

---

[6] His yearly salary at that time was $50,000.

[7] See, also, Rule 23 (b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c.

the present situation, we are satisfied that appellees had the right to bring suit. Indeed, in their brief appellants freely admit that the taking of a bonus "cannot be ratified by the Board of Directors so as to confirm to the officer the retention of the illegal consideration, or as to prevent suit by the bank or a stockholder in its behalf for its recovery."

5. A final contention of appellants is that the suit is barred by the statute of limitations.

■ The applicable statute (Cal.Code of Civil Proc. § 338, sub. 4) provides that an action for relief on the ground of fraud or mistake must be brought within three years, but that "the cause of action in such case [is] not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake." The aggrieved party in this case is the Bank. Earl v. Lofquist, 135 Cal.App. 373, 27 P.2d 416; Whitten v. Dabney, 171 Cal. 621, 154 P. 312; People ex rel. Eadie v. Noyo Lbr. Co., 99 Cal. 456, 34 P. 96; 16 Cal.Jur. 503–504. The trial court, however, made no finding as to the time the Bank discovered the fraud. It found only that the plaintiff stockholders did not discover it until less than three years before the commencement of the action.[8]

■ The pleadings did not specifically frame an issue in respect of the Bank's notice or knowledge of the fraud. We doubt, therefore, that appellants are in a position to urge the bar of the statute insofar as it relates to the Bank itself. Whether the trial court regarded the statute as having been waived by failure properly to plead it, and for that reason made no finding, we are unable to determine. However, since the parties have assumed that the question is properly before us, we will consider and decide it.

■ We are satisfied that the proof is such as to require a finding that the Bank did not discover the fraud until appelleees brought it to light by their investigations. Hence the action is not barred as to the Bank.

■ The word "discovery", as used in the statute, means actual knowledge, or knowledge of facts which, in the exercise of due diligence, would have led to an actual discovery of the fraud. Consolidated Reservior & Power Co. v. Scarborough, 216 Cal. 698, 701, 703, 16 P.2d 268; Lady Washington, etc., Co. v. Wood, 113 Cal. 482, 45 P. 809; Victor Oil Co. v. Drum, 184 Cal. 226, 240, 193 P. 243; Prentiss v. McWhirter, 9 Cir., 63 F.2d 712, 715.

The evidence shows that, at most, the Bank knew that the loans were to be used in a venture in which Fleishhacker was a partner. Burges, who was an assistant in the note department at the time the loans were made, had been told by Alexander, head of the department, that Fleishhacker was a partner in the steel venture; and nobody considered the matter a secret. But Burges believed, erroneously, that Fleishhacker was a partner in M. Barde & Sons, Inc.; he did not know the details.

Mortimer Fleishhacker, a member of the Finance Committee which approved the loans, was perhaps in a better position to know the facts than any one else in authority in the Bank. But he thought that Herbert Fleishhacker "was to personally put up a large sum of money and the Bardes were to match that sum"; that Herbert Fleishhacker and the Bardes were to be partners, "and each in a substantial amount". He knew that the loans were to be used in the new enterprise, but he did not know that they were to be sent East as a deposit on the contract.

Herbert Fleishhacker stated that he discussed the loans with the other members of the Finance Committee (Mortimer Fleishhacker, J. J. Mack,[9] and Sigmund Stern [9]), explaining that the loans were to be made in connection with a steel deal in which he was to become partner. It is significant, however, that Fleishhacker did not testify that he ever disclosed the particular terms of his deal with the Bardes. And, if the knowledge of Mortimer Fleishhacker is any criterion (and we think it unlikely that his colleagues on the Finance Committee knew any more than he), it appears that the Bank was actually misled by Herbert Fleishhacker into believing that he, personally, was furnishing half the money for the venture. The Bank, therefore, had no reason to suspect that the

---

[8] It may be that the suit could be barred as to the complaining stockholders, even though not barred as to the corporation itself, or as to other stockholders. See Whitten v. Dabney, supra, 171 Cal. at page 629, 154 P. 312. It is clear, however, that no suit can be maintained if the cause of action is barred as to the corporation.

[9] Deceased at time of trial.

consideration furnished by him for his interest in the business included his efforts in causing the loans to be made.

It is also to be noted that the records of the Bank showed that the loans were made to M. Barde & Sons, Inc., which firm had an established line of credit at the Bank, and that they were promptly paid. Thus the records were not such as would tend to excite suspicion or put the Bank on inquiry.

It is true that the burden of proving lack of discovery by the Bank rested upon appellees. Earl v. Lofquist, supra; Lady Washington, etc., Co. v. Wood, supra; Consolidated Reservoir & Power Co. v. Scarborough, supra. But we think this burden has been discharged.

Affirmed, as to appellant Fleishhacker; reversed, as to appellants Thompson, Klinker, and Palo Alto Stock Farms, Inc.

MATHEWS, Circuit Judge (dissenting).

As stockholders of the Anglo California National Bank of San Francisco [1] (hereafter called Anglo), appellees brought this suit against appellants—Herbert Fleishhacker, Victor Klinker, Harry T. Thompson, Palo Alto Stock Farms, Incorporated (hereafter called Stock Farms), and Anglo —to recover of Fleishhacker, Klinker, Thompson and Stock Farms, for Anglo, profits alleged to have been made by Fleishhacker, with the aid and assistance of Klinker, Thompson, and Stock Farms, from the use of money belonging to Anglo. The bill of complaint alleged that the profits so made exceeded $148,125, and prayed for an accounting. Appellants defended on the ground, among others, that appellees had no right to bring or maintain the suit. From a decree [2] in appellees' favor for $736,485.57, this appeal is prosecuted.

Appelles are citizens of France. Fleishhacker, Klinker and Thompson are citizens of California. Stock Farms is a California corporation. Anglo is a national banking association located in California. At all times here pertinent, Fleishhacker was Anglo's president. He was also a member of its board of directors. Klinker and Thompson were employees of Anglo, but were not directors. On October 29, 1934,

appellees' agent, Etienne Lang, wrote and delivered to the chairman of the board the following letter, addressed to the directors:

"I am agent for the following stockholders of the Anglo California National Bank of San Francisco [naming appellees] and am writing this letter on their behalf. The said stockholders have been apprised of certain matters pertaining to Herbert Fleishhacker, president of said bank, and the loans of funds by the said bank to J. N. Barde and L. B. Barde during the period from 1919 to 1923.

"These stockholders have been informed that the said Bardes, desiring to borrow $500,000 to use in buying steel from the United States Government for purposes of resale, agreed to pay Herbert Fleishhacker personally one-half of the profits from the enterprise if he would make that amount of money available to them. That pursuant to said agreement said Herbert Fleishhacker caused the Anglo California National Bank of San Francisco (then known as the Anglo and London Paris National Bank of San Francisco) to loan $325,000 to the said Bardes ($250,000 on December 16th, 1919, and $75,000 on December 21, 1919) and arranged for said Bardes to borrow $175,000 from the Central National Bank of Oakland. These loans were repaid in a few months. Said Bardes caused a corporation to be organized named the Barde Steel Products Co. through which to conduct such enterprise, and caused one-half of the stock of said corporation to be issued to nominees of the said Fleishhacker [3] for his benefit. Further, the Anglo California National Bank of San Francisco loaned the said Barde Steel Products Co. during the period between 1920–1923 additional sums of money for use in such enterprise aggregating in excess of $100,000.

"These stockholders are further informed that the said Fleishhacker received large profits pursuant to his said agreement with the said Bardes and in this regard that he received $50,000 on September 20th, 1920, and $25,000 on March 16th, 1921, from the Barde Steel Products Co. as a purported salary from said company, although he was not an officer or employee of said concern. Further, that there was paid on the stock of the said Fleishhacker, held by nominees for him, the sum of $73,125 in

---

[1] Formerly the Anglo and London Paris National Bank of San Francisco.

[2] Blum v. Fleishhacker, D.C., 21, F. Supp. 527.

[3] The bill alleged that Fleishhacker's nominees were Klinker, Thompson and Stock Farms.

dividends, and that in March, 1923, the said Herbert Fleishhacker sold his interest in the Barde Steel Products Co. to the Barde Bros. for a large sum of money.

"Under these circumstances, the stockholders believe the profits received by the said Herbert Fleishhacker rightfully belong to the Anglo California National Bank of San Francisco, and on their behalf I now make demand on you forthwith to institute on behalf of the bank the necessary suit to recover all profits received by Herbert Fleishhacker in the transactions just referred to."

The letter was presented to the board of directors at a meeting held on November 13, 1934. The board refused to comply with appellees' demand. Thereafter, on December 5, 1934, appellees commenced this suit, seeking thereby to recover for Anglo the profits mentioned in the letter. Appellants moved to dismiss the bill on the ground, among others, that it did not state facts sufficient to constitute a cause of action. The motion was denied, appellants answered, the case was tried, and on March 29, 1938, the District Court entered its decree in appellees' favor. Appellants seek reversal.

This was, as indicated, a suit in equity which appellees, as stockholders of Anglo, brought in their own names on a cause of action which—if it existed at all—existed in Anglo itself, and in which Anglo itself was the appropriate plaintiff. Hence, to determine whether or not appellees were entitled to maintain this suit, we should apply the doctrine of Hawes v. Oakland, 104 U.S. 450, 460, 26 L.Ed. 827:[4]

"* * * [To] enable a stockholder in a corporation[5] to sustain in a court of equity in his own name, a suit founded on a right of action existing in the corporation itself, and in which the corporation itself is the appropriate plaintiff, there must exist as the foundation of the suit—

"Some action or threatened action of the managing Board of Directors or Trustees of the corporation, which is beyond the authority conferred on them by their charter[6] or other source of organization;

"Or such a fraudulent transaction, completed or contemplated by the acting managers, in connection with some other party, or among themselves, or with other shareholders as will result in serious injury to the corporation,[7] or to the interests of the other shareholders;

"Or where the Board of Directors, or a majority of them, are acting for their own interest, in a manner destructive of the corporation itself, or of the rights of the other shareholders;

"Or where the majority of shareholders themselves are oppressively and illegally pursuing a course in the name of the corporation, which is in violation of the rights of the other shareholders, and which can only be restrained by the aid of a court of equity.

"Possibly other cases may arise in which, to prevent irremediable injury, or a total failure of justice, the court would be justified in exercising its powers,[8] but the foregoing may be regarded as an outline of the principles which govern this class of cases."

---

[4] Reaffirmed in Huntington v. Palmer, 104 U.S. 482, 26 L.Ed. 833; Detroit v. Dean, 106 U.S. 537, 539–542, 1 S.Ct. 560, 27 L.Ed. 300; Quincy v. Steel, 120 U.S. 241, 244–249, 7 S.Ct. 520, 30 L. Ed. 624; Corbus v. Alaska Treadwell Gold Mining Co., 187 U.S. 455, 459–465, 23 S.Ct. 157, 47 L.Ed. 256; Stewart v. Washington & Alaska Steamship Co., 187 U.S. 466, 23 S.Ct. 161, 47 L.Ed. 261; Wathen v. Jackson Oil & Refining Co., 235 U.S. 635, 639–641, 35 S.Ct. 225, 59 L.Ed. 395; United Copper Securities Co. v. Amalgamated Copper Co., 244 U.S. 261, 263–265, 37 S.Ct. 509, 61 L.Ed. 1119.

[5] Anglo is a corporation. 12 U.S.C.A. § 24.

[6] As in Dodge v. Woolsey, 18 How. 331, 340–346, 15 L.Ed. 401.

[7] As in Doctor v. Harrington, 196 U.S. 579, 587–589, 25 S.Ct. 355, 49 L.Ed. 606.

[8] Such a case arises where a board of directors is pursuing a course of action amounting, in law, to a breach of trust, and such course, if persisted in, will cause the corporation and its stockholders irremediable injury. Dodge v. Woolsey, supra; Greenwood v. Union Freight R. Co., 105 U.S. 13, 16, 26 L.Ed. 961; Pollock v. Farmers' Loan & Trust Co., 157 U.S. 429, 553, 554, 15 S.Ct. 673, 39 L.Ed. 759; Smyth v. Ames, 169 U.S. 466, 515–518, 18 S.Ct. 418, 42 L.Ed. 819; Cotting v. Kansas City Stock Yards Co., 183 U.S. 79, 112, 113, 22 S.Ct. 30, 46 L.Ed. 92; Doctor v. Harrington, supra; Delaware & Susquehanna R. Co. v. Albany & Susquehanna R. Co., 213 U.S. 435, 445–453, 29 S.Ct. 540, 53 L.Ed. 862; Brushaber v. Union Pacific R. Co., 240 U.S. 1, 9, 10, 36 S.Ct. 236, 60 L.Ed. 493, L. R.A.1917D, 414, Ann.Cas.1917B, 713; Smith v. Kansas City Title Co., 255 U.

Applying these principles, I find here a total lack of any factual showing entitling appellees to maintain this suit. There was neither allegation nor proof that Anglo's board of directors had done or threatened to do any act which was beyond the authority conferred on them by their charter or other source of organization;[9] or that any fraudulent transaction had been completed or contemplated by the board of directors; or that the board, or a majority of them,[10] were acting for their own interest, in a manner destructive of Anglo, or of the rights of other stockholders; or that a majority of Anglo's stockholders[11] were oppressively and illegally pursuing a course, in the name of Anglo, which was in violation of the rights of other stockholders; or that irremediable injury would be suffered, or that a total failure of justice would occur, if the court did not exercise its preventive powers.

The sole "foundation"[12] of this suit was the failure of Anglo's board of directors to bring suit, in Anglo's name, against Fleishhacker, Klinker, Thompson and Stock Farms. The bill did not directly charge that such failure was, in any respect, wrongful or improper. The only allegation of the bill which could possibly be regarded as constituting such a charge was "that the causes for such failure * * * are that the board of directors is composed of relatives, close friends and business associates of the defendant Fleishhacker and are under the domination[13] of the defendant Fleishhacker." This allegation was denied and not proved. Only one relative of Fleishhacker was shown to be a member of the board.[14] That the other members were close friends and business

associates of Fleishhacker was immaterial, if true. There is no evidence that any member of the board was dominated by Fleishhacker.

Domination of the board by Fleishhacker was not—as the trial court supposed—to be inferred from the fact that the chairman of the board, in acknowledging receipt of the above mentioned letter, promised to "communicate" later with appellees' agent, but failed to do so; or from the fact that the board did not request appellees' agent to appear and offer proof of the charges made in the letter, but "merely passed a resolution that no action be taken;" or from the fact that, having been joined as a defendant in this suit, Anglo "made common cause" with its co-defendants.[15] The board may, in good faith, have believed that the charges made in the letter were false and unfounded; that Anglo had, in fact, no right of action against Fleishhacker, Klinker, Thompson or Stock Farms; and that it could not, in equity or good conscience, bring suit against them, or leave appellees' suit undefended. Lacking proof to the contrary, we should—and I do—presume that the board acted in good faith. Corbus v. Alaska Treadwell Gold Mining Co., 187 U.S. 455, 463, 23 S.Ct. 157, 47 L.Ed. 256.

Even if the board had believed that Anglo had a right of action, it might also, in good faith, have believed that it was not to Anglo's best interest to bring suit thereon and, so believing, might properly have waived such right of action. Hawes v. Oakland, supra, 104 U.S. at page 462, 26 L. Ed. 827; Corbus v. Alaska Treadwell Gold Mining Co., supra; United Copper Securities Co. v. Amalgamated Copper Co., 244

S. 180, 200–202, 41 S.Ct. 243, 65 L.Ed. 577; Hill v. Wallace, 259 U.S. 44, 60–62, 42 S.Ct. 453, 66 L.Ed. 822; Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 318–323, 56 S.Ct. 466, 80 L.Ed. 688; Carter v. Carter Coal Co., 298 U.S. 238, 286, 287, 56 S.Ct. 855, 80 L.Ed. 1160.

[9] 12 U.S.C.A. §§ 24–40, 71–78.

[10] Anglo was, by law, required to have at least five directors. 12 U.S.C.A. §§ 71, 71a. In 1919—the earliest year in which any of the acts complained of were said to have occurred—it had 19 directors. There is no evidence that the number was diminished. We may assume, therefore, that Anglo had, at all pertinent times, 19 directors. Of these, only Fleishhacker was sued.

[11] The record does not show how many shares of stock Anglo had outstanding, or what their par value was. There is no evidence that Klinker, Thompson or Stock Farms owned any of Anglo's stock. There is no direct evidence that Fleishhacker owned any, but, being a director, he presumably owned shares having a par value, in the aggregate, of not less than $1,000. 12 U.S.C.A. § 71a. We have no reason to suppose that he owned a majority of Anglo's stock.

[12] Hawes v. Oakland, supra.

[13] Compare Delaware & Hudson Co. v. Albany & Susquehanna R. Co., supra.

[14] See footnote 10.

[15] Blum v. Fleishhacker, supra, 21 F. Supp. at page 534.

U.S. 261, 263, 264, 37 S.Ct. 509, 61 L.Ed. 1119.

Having failed to show that the board's failure to sue constituted a fraud or breach of trust, or that it was in any respect wrongful or improper, appellees had, and have, no standing to maintain this suit.

The decree should be reversed and the case should be remanded with directions to dismiss the bill of complaint.