DENICKE v. ANGLO CALIFORNIA NAT. BANK OF SAN FRANCISCO et al.

No. 21033–S.

District Court, N. D. California, S. D.

June 29, 1942.

See, also, D.C., 26 F.Supp. 240.

Chickering & Gregory, Donald Y. Lamont, and Frederick M. Fisk, all of San Francisco, Cal., for petitioner, defendant Bank.

Aaron M. Sargent, of San Francisco, Cal., for Ernest E. Denicke, plaintiff and objector, and Mary E. Doble, objector.

ST. SURE, District Judge.

Defendant Anglo California National Bank of San Francisco has filed a second petition for termination and dismissal of the above-entitled action. The first petition included a similar action (Denicke v. Mortimer Fleishhacker et al., No. 21161-R) pending before my associate Judge Roche. An offer was made to compromise and terminate all litigation upon the payment of $350,000. The second petition submits an offer of compromise for $200,000 and relates only to the instant case. Oppositions were filed to the first petition by plaintiff and Mary E. Doble, both shareholders of the defendant bank. Judge Roche and I sat together in a lengthy hearing (July 14 to July 23, 1941), at which testimony was taken and arguments made. After submission and consideration, we made an order denying the petition "without prejudice to the filing by said bank, if so advised, of separate offers of compromise in each of the actions." Petitioner had sought to dismiss not only the actions pending in this court, but also to dispose of other matters with which this court was

not concerned. The first petition and all proceedings had in connection therewith are specifically referred to and incorporated in the second.

Defendant bank is a national banking association, having its principal place of business in San Francisco. Plaintiff is the record owner of 1,600 shares of the bank's common capital stock, out of a total of 410,000 shares of common and 1,925,000 shares of preferred stock, issued and outstanding. On November 7, 1938, plaintiff brought this secondary action pursuant to rule 23(b), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, in which a money judgment is asked against each of the defendants except petitioner. Being merely a nominal party to the action defendant bank has neither served nor filed any pleading, either denying or asking the relief prayed for by plaintiff.

This secondary or derivative action stems from the case of Blum v. Fleishhacker, D. C., 21 F.Supp. 527, in which I held that Herbert Fleishhacker, then director, president and chief executive officer of defendant bank, had violated his trust to the bank and its stockholders in fraudulently making a private profit for himself in a steel venture. The action is brought under the provisions of 12 U.S.C.A. §§ 93 and 503, imposing personal liability upon executive officers and directors of national banks and member banks of the Federal Reserve System when loss is sustained through violation of Federal statutes. It is claimed that §§ 83, 84, 375a and 595, 12 U.S.C.A., have been violated.

The second amended complaint contains eight counts. The first count is against defendants Mortimer Fleishhacker and Herbert Fleishhacker, and the second is against the same defendants and Mortimer Fleishhacker, Jr., Empire Farms, Inc., Charles E. MacLean, R. H. Holmberg, Mandeville Island Farms, Roscoe C. Zuckerman, Sol D. Klein and Jack Klein.[1]

Briefly, count one alleges that on January 1, 1920, defendants Herbert and Mortimer Fleishhacker conspired to defraud one George Shima and Anglo and London Paris National Bank of San Francisco, predecessor to defendant bank, by using their respective offices and control to cause said predecessor bank to make loans to Shima and enterprises in excess of the legal loan limit, in violation of 12 U.S.C.A. § 84, in order to extract bonuses or emoluments from Shima. In support of this claim it is alleged that between January 1, 1920, and the death of Shima on March 27, 1927, certain loans were made to Shima and enterprises; that subsequently additional loans were made to his estate and enterprises; that these loans have not been paid; that at the time of the making of said loans, the predecessor bank's loan limit never exceeded $500,000; that certain bonuses were received by defendant Herbert Fleishhacker. In addition to the return of the principal, it is claimed that an interest charge should be exacted, determined by compounding 6% over a long period of years.

In the second count it is alleged that on January 1, 1930, the Shima Estate and enterprises owed the predecessor bank amounts in excess of its loan limit; that the predecessor bank held no security and the obligors were insolvent; that defendants Herbert and Mortimer Fleishhacker conspired to reorganize the Shima Estate and enterprises, in order to cover up their liability by reason of making excess loans; that to bring about this reorganization, the said Fleishhackers used their offices to cause the predecessor bank to advance additional sums to defray the expenses of reorganization. It is then alleged that on June 30, 1932, the predecessor bank was consolidated with the Anglo California Trust Company to form the present banking association; that after such consolidation defendants Mortimer, Herbert and

---

[1] On Monday, June 15, 1942, plaintiff made application under Section 23(c), F.R.C.P., for leave to dismiss without prejudice the action against defendants Mandeville Island Farms, Inc., Roscoe C. Zuckerman, Sol D. and Jack Klein. Plaintiff states that there is legal doubt whether it would be possible to recover any judgment against said defendants. "Investigation indicates that substantially all of the loans which are within the scope of the second count made after October 1, 1936, constitute a violation of the 10% limit established by 12 U.S.C. A. Section 84." In applying for leave to dismiss "plaintiff does so, expressly reserving all rights as against each of the other defendants who are joined. There has been no consideration of any kind given for the dismissal sought by this application, and there have been no covenants of any kind entered into which would in any way affect the liability of any other party to the suit." The application is pending.

Mortimer Fleishhacker, Jr., conspired to cause defendant bank to advance moneys for the purpose of improving Mandeville Island, an asset of Empire Farms, Inc., the corporation which resulted from the foregoing reorganization, in order that the Fleishhackers could subsequently purchase said asset at an inadequate consideration; that in order to further this conspiracy, another corporation, Mandeville Island Farms, Inc., was formed whose stockholders were Roscoe Zuckerman and Sol and Jack Klein; that said stockholders were merely dummies for the Fleishhackers; that the Fleishhackers then, through their control of Empire Farms, Inc. (the petitioner had become a large shareholder by accepting stock for the obligation of the Shima Estate), caused it to sell Mandeville Island to Mandeville Island Farms, Inc., for an inadequate consideration. It is then claimed that defendant bank made advances to Mandeville Island Farms, Inc., and that Empire Farms, Inc., likewise made advances to Mandeville Island Farms, Inc., and in one instance made gifts. It is further claimed that defendants MacLean and Holmberg, as officers of Empire Farms, Inc., were merely tools of the Fleishhackers; that Empire Farms, Inc., sustained damages in that it did not receive all of the purchase price of Mandeville Island and that through the sale of Mandeville Island its financial position was so affected that it was unable to meet its obligations to Pacific Mutual Life Insurance Company, which company held a mortgage on the Shima tract, originally one of the Shima assets turned over to Empire Farms, Inc., under the above reorganization.

Counts third to eighth set up claims against directors of the predecessor bank for the periods during which said directors served on said bank's board, based on the transactions referred to in counts first and second, and the claim that such directors during the respective periods of their office abdicated and delegated their duties to the defendants Herbert and Mortimer Fleishhacker, thereby defrauding the predecessor bank.

In a supplemental amendment to the second amended complaint plaintiff alleges in his ninth count that Herbert and Mortimer Fleishhacker used the credits of the bank in the support of personal ventures in which they and other defendants were interested, and that all of these defendants conspired to use the credits of the bank in violation of Federal banking laws; that the bulk of these accounts were carried under the name of Progress Mortgage Company.

In the tenth count it is claimed that at a time when the Progress Mortgage Company was indebted to the bank in an amount in excess of the 10% limit established by 12 U.S.C.A. § 84, with the knowledge of these defendants of the excess, new loans were made to them and carried in the name of the Progress Mortgage Company at inadequate rates of interest, and that the bank sustained losses on these accounts.

The evidence disclosed at the hearing on the petition shows that Empire Farms, Inc., presently owes the petitioner $1,408,499.68. To secure this obligation, the petitioner holds first liens on Bouldin Island and Mandeville Island subject to a subordination to the Disaster Loan Corporation in the sum of $120,000. Bouldin Island is presently appraised at $810,000, and the petitioner's equity in Mandeville Island at $280,000, making a total recovery of $1,090,000 probable. Though the petitioner has an equity in the Shima Tract, Pacific Mutual Life Insurance Company has a first lien, and it is not believed that there will be any realization from this equity. The petitioner has instituted foreclosure proceedings on the Mandeville and Bouldin Island Tracts but these proceedings are being held up by the Zuckerman and Klein interests through bankruptcy proceedings.

Mandeville Island Farms, Inc., owes the petitioner two amounts, $103,101.96 and $54,344.52. The second item is fully secured and will be paid in full. There probably will be a loss on the first item.

There is no indebtedness on the part of the George Shima estate or George Shima enterprises, such obligations having been exchanged for the stock interest in Empire Farms, Inc. Petitioner does not anticipate any recovery on such stock interest.

According to the testimony of Ernest Berges, an official of the defendant bank, the records of the bank do not indicate that any officer or director of petitioner or its predecessor, received any secret profit out of the above-mentioned transactions.

Since this Court's decision on December 6, 1937, in Blum v. Fleishhacker, supra, there has been a change in the management of defendant bank. Neither Herbert, Mortimer nor Mortimer Fleishhacker, Jr., are now connected with the institution. In

1938, upon suggestion of the Reconstruction Finance Corporation there was a recapitalization of defendant bank. The Reconstruction Finance Corporation invested $22,000,000 in the bank, and now holds practically all of the preferred stock. Following the recapitalization Mortimer Fleishhacker paid to the bank the sum of $2,590,000 in settlement of claims against him. On November 23, 1938, Herbert Fleishhacker on his own application was adjudged a bankrupt. Defendant bank has been allowed a claim against the bankrupt's estate in the sum of $825,000. In addition there is a claim of $790,000 as a result of the judgment in the Blum case, supra, making a total of claims in excess of $1,600,000 which the bank has outstanding against the bankrupt's estate. It is expected that between 40 and 50 per cent of these claims will be collected.

Following the filing of the first petition a special meeting of the stockholders of the defendant bank was held on July 7, 1941, to consider and vote upon the acceptance or rejection of the offer that had been made to pay the bank $350,000 upon dismissal of the two actions pending in this Court and also an action pending in the State Court. A resolution was offered accepting the offer. Discussion followed in which Aaron M. Sargent, attorney for plaintiff and for Mrs. Doble, objecting shareholders, participated. Mr. Sargent read a prepared statement in opposition to the resolution.

A vote was taken upon the adoption of the resolution with the following result: 1,924,-480 shares of preferred stock and 305,112 shares of common stock voted in favor of the resolution; 4,336 voted against the resolution, which was declared adopted.

On the date of the filing of the present petition, the board of directors of defendant bank was composed of Fred W. Ackerman, Othmar Berry, Richard D. Brigham, Allard A. Calkins, Harry D. Collier, Adrien J. Faulk, Maurice E. Harrison, Paul E. Hoover, Sara H. Husbands, Samuel Kahn, Berkley Neustadt, William B. Reis, William H. Thompson and Willard O. Wayman. The chief executive officer was William H. Thompson, the president. The executive committee, authorized by the by-laws, was composed of William H. Thompson, ex-officio; Othmar Berry, Allard A. Calkins, Samuel Kahn and Willard O. Wayman.

On March 14, 1942, petitioner received written offers from various defendants offering to terminate this action by payment to defendant bank of the sum of $200,000. President Thompson presented the offers to the bank's executive committee for consideration and action, and in the present petition, which he verifies, says: "Your petitioner, through various of its representatives, has made a careful investigation and examination of the circumstances surrounding the litigation involved in said action solely from the point of view of the best interests of your petitioner; that as a result of such investigation and examination, the conclusion has been reached that the best interests of your petitioner will be served by accepting said offers and concluding said litigation, subject, however, to the approval of the above entitled court and other terms and conditions of said offers." The offers were approved by the executive committee and also by the directors of defendant bank.

Plaintiff is the owner of 1,600 shares, and Mrs. Doble, the other objector, is the owner of 1,752 shares of the common stock of defendant bank. Numerous objections to the petition are interposed.

 It is contended that plaintiff having established a legal status under rule 23(b), Federal Rules of Civil Procedure, "now holds the sole right to control the litigation until judgment, or until payment of consideration adequate in amount, in view of all the circumstances to discharge the liability." In this objection plaintiff misconceives the law and the nature of the litigation. In instituting suit he acts as a trustee, for the benefit of defendant bank and its stockholders, to redress corporate injuries. The remedy sought is equitable in character. Plaintiff has no personal wrong for which he is entitled to seek redress. "The stockholder does not bring such a suit because *his* rights have been *directly* violated, or because the cause of action is *his* or because *he* is entitled to the relief sought. He is permitted to sue in this manner *simply in order to set in motion the judicial machinery of the court*. [Emphasis in opinion] (3 Pomeroy's Equity, 3d ed. sec. 1095). * * * He is a trustee pure and simple, seeking in the name of another a recovery for wrongs that have been committed against another. His position in the litigation is in every legal sense the precise equivalent of that of guardian ad litem." After the judicial machinery is set in motion, the control of the litigation is with the court, and the "action shall not be dismissed or compromised without the approval

of the Court." 23(c), Federal Rules of Civil Procedure.

It is further objected "that the officers, directors and executive committee of defendant bank are each without legal power to provide by resolution or otherwise, for the acceptance of the compromise offer referred to in said petition, or to bind the plaintiff or the Court in that respect." I know of no legal inhibition against the officers of defendant bank adopting a resolution accepting the offer of compromise subject to the Court's approval. Such action is not binding upon plaintiff because of his special status discussed above. Nor is it binding upon the Court, but, depending upon circumstances such as shown here, may be persuasive. Notice of the special meeting of July 7, 1941, to consider and vote upon the offer to compromise and terminate the litigation, was mailed to each of the shareholders and published in newspapers of general circulation. After a full discussion the resolution accepting the offer and submitting the matter to the court was adopted almost unanimously. The vote in favor was 99.781 per cent of the stock and the vote against was .195 per cent of the stock; in other words, less than 1/5 of 1 per cent voted against the resolution.

It is further objected that there is "gross inadequacy of consideration when compared with the amount of liability and the sum which can be collected from the defendants in the event of judgment". It is claimed that under the eighth count of the complaint, "there is a certainty of recovery in an amount exceeding $750,000 for excessive lending to Empire Farms, Inc., and as the nominee or borrowing agency of Mandeville Farms, Inc."; that "the liability under the supplemental amendment to the second amended complaint herein, involving Progress Mortgage Company, is believed to be very substantial, probably a sum between $2,500,000 and $5,000,000 concerning substantially all of the defendants in the case."

Mr. Thompson, president of defendant bank, testified that since becoming its chief executive officer, he had given much time and thought to a settlement of the litigation in which the bank is involved. After careful investigation and consideration he reached the conclusion that it was for the best interests of the bank and its shareholders to accept the offer of compromise. "I think there are some thirty-four defendants involved in this whole case," testified Mr. Thompson regarding the two cases pending in this court, "each of those men has his own separate defense concerning his participation in the past conduct of the bank's affairs, and I assume that each of them is entitled to his day in Court." "The litigation might be most protracted, * * * and a judgment rendered in a sum greater than the amount involved [$350,000], but there would still be the question of collecting it." Men pass away, fortunes disappear. Judgment in the Blum case, supra, was rendered in 1937. The bank has approved claims in the sum of $1,600,000 against the estate of Herbert Fleishhacker, bankrupt, but has not as yet collected. "Literally millions of dollars of the claims that are involved in this lawsuit have been collected and paid. Mortimer Fleishhacker himself was requested by the Reconstruction Finance Corporation at the time it purchased the stock [for $22,000,000] to put up out of his assets, and to obligate himself in order to do it, an aggregate sum of $2,590,000." The amount has been paid.

In the instant case Mr. Sargent, attorney for the objectors, says that he believes that the liability of the defendants will be as much as $5,000,000. He closes his estimate with the statement: "No settlement which the court would be justified in accepting herein should be less than the sum of $750,000 for the liability under the eighth count, plus an appropriate amount for the Progress Mortgage Company accounts." In the case pending before Judge Roche (21,-161-R) it is claimed that net damages in the sum of $1,633,186.99 are recoverable, also miscellaneous other losses chargeable to mismanagement in the sum of $3,491,193.42. Notwithstanding these impressive figures amounting to a total of $10,124,380.41[2] in the two cases pending in this court, Mr. Sargent began having conversations with President Thompson looking toward compromise of the litigation at a greatly reduced figure. The negotiations began in 1939. An offer of $250,000 was mentioned to Mr. Sargent who said that it was inadequate. Mr. Thompson testified that at some time during the negotiations Mr. Sargent suggested that the minimum figure should be $500,000. This statement is not denied.

---

[2] In a recapitulation contained in a brief filed by plaintiff upon the hearing of the first petition the "grand total" of the amount probably recoverable is fixed at $16,059,775.49.

530

There is a noticeable difference between $500,000 and the "grand total" of $16,059,-775.49.

"It is one thing to assert a claim and another thing to prove the claim to judgment. Furthermore, it is one thing to obtain a judgment, and quite another thing to collect it. Figures, however imposing, should not compel practical considerations to yield place to visions". Karasik v. Pacific Eastern Corporation, Del.Ch., 180 A. 604, 609.

In the Karasik case the claims in the primary suits involved as much as one hundred million dollars. A compromise offer of $385,000 was accepted by the directors and stockholders and approved by the Court, which said, at page 611 of 180 A.: "When it comes to the compromise of highly controverted disputes, the field is a peculiarly appropriate one for the exercise of the honest business discretion of a corporation's duly accredited managers."

"Mr. Sargent said that he felt it was proper to have some understanding in respect of his fee," testified Mr. Thompson. "That he was entitled to compensation for the work which he had done." Mr. Sargent was requested to put in writing his ideas about fees. On January 23, 1941, Mr. Sargent wrote a letter to Mr. Thompson relative to the "Denicke litigation—Allowance of counsel fees and expenses." He asked for fees and expenses in the sum of $210,000.[3] On May 14, 1941, a form of contract covering the matter of fees and expenses was submitted by Mr. Sargent to Mr. Thompson. In the proposed agreement Mr. Sargent was named party of the first part and the bank as party of the second part. The subject matter was services performed for plaintiff in connection with the two suits pending in this Court. Pertinent parts of the proposed contract read as follows:

"1: That second party shall pay to first party, the following in full satisfaction of any and all claims for compensation due or to become due, including reimbursement for costs, expenses and all charges incurred in relation to the proceedings above described, to-wit:

"(a) The sum of $110,000. to be due and payable upon compliance with the conditions specified in subdivisions (a) and (b) of paragraph 3 hereof;

"(b) The sum of $25,000. on January 15, 1942, and a like amount to be paid on the 15th of January of each year following, to and including January 15, 1945,—the payments required under this subdivision (b) aggregating the sum of $100,000."

Subdivisions (a) and (b) of paragraph 3 read as follows:

"(a) First party and Ernest H. Denicke shall each execute and deliver to second party documents sufficient as to form to unconditionally release and discharge all right which they or either of them may have to apply for, and/or to claim in any legal proceeding pending, or which hereafter might be brought, any right or allowance to them or either of them, for such reimbursement and allowance for compensation for legal services;

"(b) First party and the said Ernest H. Denicke shall each execute and deliver to second party specific waiver of the right to apply to the court in actions 21033–S and 21151–R, for any allowance on account of counsel fees or expenses in connection with said proceedings."

The demand for fees and expenses was rejected by defendant bank. The actions of Mr. Sargent in relation to a settlement of the litigation and the securing for himself attorney's fees and expenses were without the knowledge or sanction of the Court.

---

[3] In his letter of January 23, 1941, regarding fees Mr. Sargent said:
"I do not consider that it is practical to refer the matter to court for determination because it has to do not only with legal rights existing at present—it also involves future considerations of the kind outlined. Furthermore, it is not possible for me to make an adequate presentation in court without introducing a considerable amount of evidence to show the circumstances surrounding the performance of the services, and the extent to which the corporation made recoveries in consequence of the work done. There appears to be no reason why an agreement cannot be arrived at and approved by those members of the board who have no connection with pending litigation.

"I believe that there should be an absolute agreement covering my services and that it should not be contingent upon any action the court may take in approving a compromise of the litigation. We are willing to cooperate in any proper plan for settlement of these cases. We are prepared to do that on the ground that such a plan will be for the best interests of the shareholders. Since that is true, the corporation is the beneficiary of the arrangement and should agree to make compensation for all services rendered on its behalf."

■ The objections to the petition are without merit, further discussion of them is unnecessary, and they will be overruled. Defendant bank and its officers acted in good faith and for the best interests of the bank and its shareholders in recommending the acceptance of the offer of compromise and settlement. The petition will be granted.