[No. 29146. Department One. January 4, 1944]

C. W. GOODWIN et al., Appellants, v. W. A. CASTLETON et al., Respondents.[1]

[1]Reported in 144 P. (2d) 725.

*E. D. Phelan,* for appellants.

*Holman, Sprague & Allen, James E. Prince, Wright & Wright, Elias A. Wright, Ira D. Orton, Elmer W. Leader,* and *Hulbert, Helsell & Paul,* for respondents.

STEINERT, J.—A stockholder of a corporation instituted a derivative action on behalf of the corporate body against certain individuals constituting a partnership and against the former, as well as the present, officers and directors of the corporation. The purpose of the action was to procure a decree of court compelling specific performance of a contract alleged to have been entered into by and between the partnership and the corporation, and, at the same time, setting aside a lease agreement made between the same parties; and, further, to recover for alleged fraud, conspiracy, and unconscionable activities on the part of the respective defendants resulting in the disposition of corporate property. In a second amended complaint, five additional stockholders were joined as plaintiffs in the action.

Three other stockholders appeared in the cause and filed a complaint in intervention, constituting another derivative action, in which the relief sought by them against the defendants was different from that sought by the plaintiffs in their second amended complaint.

The defendants, appearing in several separate groups, filed answers, all of which contained general denials and some of which also contained affirmative defenses, the latter being in turn denied by the plaintiffs.

After issues had been fully joined and the cause set for trial, the respective groups of defendants filed supplemental answers alleging that all of the claims asserted in the

second amended complaint and in the complaint in intervention had since been compromised and settled between the corporation and the partnership, through proper corporate action and substantially in accordance with the relief sought by the interveners in the action.

Plaintiffs objected to the filing of the supplemental answers, demurred thereto, and, upon the overruling of their demurrers, filed replies in denial of the affirmative allegations. Over the objections of the plaintiffs, the cause was then set specially for trial upon the issues raised by the supplemental pleadings, to precede trial upon the issues presented by the second amended complaint and the original answers and replies.

Upon a trial of the supplemental issues, the court, sitting without a jury, made findings of fact, established conclusions of law, and entered a decree ratifying and confirming the settlement and at the same time dismissing plaintiffs' action, with prejudice, as to all but one of the defendants. The plaintiffs alone have appealed. A number of the defendants have not appeared upon the appeal and we will therefore refer to them herein simply as defendants and not as respondents.

Stated broadly, the question upon the appeal is whether a derivative action, brought by a minority group of stockholders seeking recovery and relief upon the ground of fraud alleged to have been perpetrated upon the corporation by its officers and directors acting in conjunction with third parties, may be compromised and settled over the objections of the plaintiffs in the action, although the compromise and settlement was confirmed by a majority of the stockholders, omitting the stockholders alleged to have defrauded the corporation, and was approved by the court after a hearing and determination by it that the settlement was free from fraud and domination, that there was adequate consideration for the settlement, and that the best interests of the corporation and of all its stockholders were subserved thereby.

To afford a clear understanding of the situation presented by the case and of the issues involved therein, it will be

necessary, as well as informative, to refer at some length to the averments of the principal pleadings found in the record. Some of the facts as alleged in the pleadings are not disputed, and these will be stated first.

Respondent Kougarok Consolidated Placers, Inc., hereinafter referred to as Kougarok, was incorporated September 4, 1935, under the laws of the state of Washington, with an authorized capital stock of 200,000 shares of the par value of one dollar each. December 11, 1937, the articles of incorporation were amended, increasing the capital stock to 400,000 shares of the par value of one dollar each. All of the original stock was issued in payment for certain placer mining claims, leases, and mining rights located on the Kougarok river, about a hundred miles north of Nome, Alaska. Appellants became stockholders of the corporation during the years 1935, 1936, and 1937, and now own approximately 25,000 shares, of which appellant Frank Kern alone holds 15,000 shares.

In February, 1937, and for some time prior thereto, defendants Herbert J. Clough, Sam L. Godfrey, and John A. Kutz were stockholders of the corporation and constituted a majority of its board of directors. During the latter half of 1939, defendant Ivan Merrick was president, or else vice-president, and also a director of the corporation. On December 21, 1940, the date of commencement of this action, the board of directors of the corporation consisted of respondents Gordon T. Shaw, Arthur W. Whalley, J. J. Keenan (who died after the commencement of the action and whose estate is now represented by respondent Ralph S. Stacy), Nick Bez, and Frank Kern (who as such director was originally made a defendant in the action, but who later joined as plaintiff in the second amended complaint and is now one of the appellants).

On March 25, 1942, and April 7, 1942, both of which dates relate particularly to the settlement agreement hereinbefore and hereinafter referred to, the board of directors consisted of respondents Gordon T. Shaw, Nick Bez, N. H. Seil, and W. A. Castleton, together with Elmer W. Leader, an attorney. On April 30, 1942, Castleton and Bez resigned

as directors and respondent Clyde W. Brokaw, one of the interveners herein, was elected as director to succeed Castleton. The other vacancy seemingly was never filled.

Respondents W. A. Castleton, J. J. Keenan, and Nick Bez, at all times herein mentioned prior to Keenan's death in 1942, were partners doing business under the firm name of Castleton & Keenan. These partners acquired mining claims in the Kougarok region in about 1937 and, except as their association has been affected by Keenan's death, have been engaged in extensive mining operations in that vicinity ever since. They were impleaded in this action as the principal defendants against whom recovery was sought for the alleged fraudulent activities.

We shall now give a summary of the material allegations of the second amended complaint upon which appellants rely for relief and recovery. It is alleged, first, that some time prior to 1937 one Jerry Sullivan and defendant James Carroll, who then owned certain placer mining claims located in the Cape Nome Mining and Recording District, leased these properties to Kougarok; that in February, 1937, defendants Clough, Godfrey, and Kutz, then owning and controlling a majority of Kougarok's capital stock and being officers and directors of the corporation, entered into a fraudulent scheme and conspiracy with respondents Castleton, Keenan, and Bez, composing the partnership of Castleton & Keenan, in pursuance of which conspiracy the officers of the corporation agreed (1) to relinquish, release, or forfeit certain of the mining claims which the corporation held under lease from Sullivan and Carroll, and (2) to sell their majority stockholdings to the partnership; that through such fraudulent scheme the partnership became the pretended owner of the particular mining claims thus relinquished and the owner of the majority stock of the corporation; that in the beginning of 1939 Kougarok owned and was operating a considerable number of mining claims which, with the buildings, supplies, and equipment used in connection therewith, were worth $500,000; that at the same time the partnership owned and was operating other mining claims in the same vicinity which, together with

the equipment used in connection therewith, were valued at approximately $245,000, and, besides, was also then operating the claims which had been wrongfully relinquished to the partnership and which had a value of $100,000; that in July, 1939, the partnership made a written offer to sell and convey to Kougarok, for 250,000 shares of its capital stock, all the machinery and real property owned or leased by the partnership; that the directors and stockholders of Kougarok, at a special meeting, called and held for that purpose on September 9, 1939, accepted the offer and, in order to consummate it, thereafter increased its capital stock to 600,000 shares and reduced its capital to $120,000; that, despite this solemn agreement, the respondent partners failed and refused to complete the agreement, to the great detriment of the corporation and its stockholders. Upon this set of allegations, appellants prayed that the written agreement be specifically enforced and for an accounting of all gold, alleged to amount to nearly a half million dollars, mined from the properties so sold to Kougarok.

It is next alleged in the second amended complaint that, in violation of the aforementioned agreement, at a special meeting of the stockholders of Kougarok, held on December 20, 1939, a resolution was adopted under which all the mining properties and equipment owned or held by Kougarok were leased to the partnership for operation by it in conjunction with certain claims then owned and operated by the partnership itself, from which joint operations the corporation was to receive seventy-five per cent of the first $101,560.24 of net profits, and fifty per cent of all additional net profits from year to year thereafter; that the meeting at which that lease was authorized was completely dominated by respondents Castleton, Keenan, and Bez, composing the partnership, who then owned or controlled more than two-thirds of Kougarok's capital stock; that in entertaining that proposition those respondents were in fact and in law dealing with themselves; that the appellants and other stockholders similarly situated were deceived in regard to that transaction, and were led to believe that it

was the same in effect as the agreement of sale theretofore made on September 9th, as above described; that, at the time of the lease on December 20th, Kougarok had no legal advice and was without counsel; that defendant Merrick, an attorney and the president of the corporation at that time, acted solely at the behest of the members of the partnership; that, moreover, the partnership did not include in the venture, as it had previously agreed to do, certain valuable mining claims owned by it and located in what is designated as the Trinity area; that the lease contained improvident and unconscionable conditions, placing all the corporate property perpetually in the control of the partnership and depriving the corporation of all use thereof and all returns therefrom; and that the partnership has realized and retained from operations in the Trinity area sums approximating $333,000 and has refused to contribute any portion of that amount to the corporation. Based on these allegations, appellants prayed that the lease of December 20, 1939, be canceled.

It is further alleged in the second amended complaint that on December 20, 1939, the officers of Kougarok, in pursuance of the fraudulent scheme and conspiracy, issued to defendant Kutz 25,000 shares of stock of the corporation for his services in effecting the lease between Kougarok and the partnership. Appellants therefore asked that this stock be restored to the corporation.

The complaint in intervention likewise set up the agreement of sale of September 9, 1939, as heretofore described, and then alleged that the lease agreement of December 20, 1939, was executed as a substitute proposition; that the stockholders were assured and led to believe that the lease agreement contained virtually the same benefits for the stockholders and involved exactly the same properties as did the previous agreement of sale of September 9th; that, without advising the stockholders, the partnership deliberately and fraudulently withheld from the joint operations contemplated by the lease certain valuable mining claims, particularly those known and described as the Trinity Bench area, having a value of approximately $160,000. The

interveners therefore prayed that the lease agreement be reformed to include the omitted claims and for an accounting of all proceeds derived by the partnership from those properties.

In their answers, respondents denied generally the allegations in the second amended complaint and in the complaint in intervention, and then by way of affirmative defenses set forth a complete history of the previous transactions between the corporation and the partnership, averring that those transactions had been conducted lawfully and in good faith and that the partnership had fully discharged all its obligations thereunder. Appellants denied the affirmative allegations of the answer as directed to them.

In the progress of the settlement of these pleadings and beginning in March, 1941, appellants took the depositions of various witnesses in support of their alleged cause of action. After issues had been fully joined, the cause was noted for trial and on June 6, 1942, it was set for trial to be had on September 28th following.

We now come to that phase of the case pertaining to the compromise and settlement of the action. On August 18, 1942, respondents, after obtaining the consent of the court and over the objections of the appellants, filed supplemental answers in the cause, alleging a series of transactions occurring since March 1, 1942, as follows:

On March 23, 1942, Castleton & Keenan, the partnership, sent a letter to Kougarok, the corporation, and to each member of the board of directors, offering to compromise and settle all controversies affecting the members of the partnership and their wives. In that proposal of settlement, the partnership offered, so far as future operations were concerned, to have included and made subject to the lease agreement dated December 20, 1939, the Trinity area claims, also many other claims acquired by the partnership since the date of that agreement, and, in addition, any other claims which the partnership might acquire in the future in stated areas.

The offer further provided that, if the proposal met with the approval of the directors, a settlement would be entered into only if the matter were submitted to the stockholders and approved by the majority of them other than those who were members of the partnership or members of the families of such partners.

A special meeting of the board of directors of the corporation was held March 25, 1942, to consider and act upon the proposal. At that time, the board of directors consisted of respondents Castleton and Bez, both of whom were members of the partnership, and respondents Shaw and Seil, and Elmer W. Leader, an attorney. Although Castleton and Bez appeared at the meeting, they did so merely for the purpose of answering any questions that might be asked of them concerning the proposal and the properties involved therein, and then retired before any action was taken thereon. The remaining directors then considered the matter and formally adopted a resolution approving and accepting the offer of settlement. The resolution set forth the reasons for approving the settlement, as follows:

(1) That the board of directors was of the opinion that the negotiations between the partnership and the corporation in September, 1939, which contemplated a sale of the partnership mining claims to the corporation for 250,000 shares of the corporate stock, were never consummated, but were abandoned;

(2) That, even if specific performance of such an agreement were available, it would be undesirable, inasmuch as the corporation would thereby lose its status as a personal holding company, would become subject to excess profits tax, and would incur extremely difficult accounting problems;

(3) That the board was unable to find that the partnership and its members had been guilty of any fraud in the negotiations leading to the execution of the lease agreement on December 20, 1939, although there may have been some misunderstanding between the partners on the one side and the stockholders of Kougarok on the other, as to the inclusion or exclusion of the Trinity area claims;

(4) That Castleton, Keenan, and Bez had shown by two years of operation that they were efficient and successful gold mine operators; and

(5) That the board was convinced that appellants' action had no merit.

On April 1, 1942, the attorneys for intervener respondents wrote to the corporation stating that they were authorized to say for their clients that they deemed the proposed settlement to be fair and equitable, and recommended that it be approved. Copies of that letter were sent to the various stockholders of Kougarok.

A stockholders' meeting was then duly called and held on April 7, 1942. At the time of that meeting, there were 297,750 shares of Kougarok capital stock outstanding and entitled to vote, of which the holders of 257,739 shares were present or represented by proxy. Mr. Castleton attended the stockholders' meeting, made a report, and answered such questions as were asked of him. Mr. E. D. Phelan, attorney for the appellants and representing by proxy 29,236 shares of stock, moved that the proposal for settlement be rejected. A ballot was taken showing 29,236 shares of capital stock voting in favor of Mr. Phelan's motion, 129,021 shares against it, with 94,973 shares, owned by members of the partnership and their families, not voting. The motion was thereupon declared lost. A motion was then made to approve the settlement. At this juncture, Mr. Phelan withdrew from the meeting. The second motion was balloted upon and carried by an affirmative vote of 129,021 shares, with no negative votes registered. The 94,973 shares held or controlled by the members of the partnership were again not voted, although it is manifest that the holders of that stock favored and approved the settlement. In addition, there were 11,000 shares of stock which would have been voted in favor of the settlement, but Mr. Leader, who represented the owner thereof, did not receive his proxy therefor until the day following the stockholders' meeting.

At a special meeting of directors, held April 30, 1942, the resignations of W. A. Castleton and Nick Bez as such

directors were accepted, and the intervener respondent Clyde W. Brokaw was elected to fill one of the vacancies so created. On June 5, 1942, at a special meeting of the directors, a form of agreement of settlement was unanimously approved and on the same day was executed by the corporation and the copartnership.

Thereafter, on August 18, 1942, the corporation and the partnership filed in the pending action their supplemental answers setting up the various steps taken to effect settlement, as above outlined, and asking that the settlement be approved by the court, and the action be dismissed. Appellants moved to strike the supplemental answers, then demurred thereto, and finally filed replies admitting the execution of the agreement, but denying its validity, and, by reference, reiterating 'the allegations contained in their second amended complaint.

On September 11, 1942, the court entered an order, pursuant to motions made, directing that the trial of the cause should first proceed on the issues joined by the supplemental answers and the replies thereto, and that trial of the main action be continued to a later date. The cause came on for trial on January 4, 1943, on the narrow issue as to whether or not a valid settlement had been effected. The trial upon that issue lasted a period of two weeks, during which time much testimony was adduced and the depositions taken by the appellants, as above indicated, were read.

At the conclusion of the trial, the court rendered an oral decision and thereafter made findings of fact specifically to the effect that there had been no showing of any fraud, conspiracy, or bad faith on the part of the directors of the corporation in consummating the settlement, or of any domination over them by anyone; that the directors had acted wisely, in good faith, after studious and careful investigation of the charges made by the appellants; that the evidence did not disclose that the stockholders who voted for the compromise were not actuated by good faith, or that they were controlled or dominated by anybody; that the corporation received good and sufficient consid-

eration for the agreement of settlement; and that there was no evidence to show that the settlement was not for the best interests of the corporation.

In our opinion, the evidence in the case overwhelmingly supports the oral decision and findings of the trial court on the questions of fact (1) as to whether the settlement was made in good faith, after mature investigation and deliberation, free from any dominating control or influence exercised by any member of the partnership upon any of the directors or stockholders; (2) as to whether the settlement was supported by adequate consideration; and (3) as to whether such settlement was for the best interests of the corporation and its stockholders.

Space will not permit a recital of the evidence and its attempt would be without profit. The testimony took a wide range, and appellants were given full opportunity to establish fraud or overreaching in connection with either the offer or the execution of the settlement. Proof was abundant that the stockholders had not only been given the opportunity of full inquiry and investigation concerning the transaction, but that they also had the advice of various counsel with respect thereto. As has already been stated, the interveners herein, who held 16,959 shares of stock and who originally had sought recovery against the partnership, after full deliberation, and upon the advice of their attorneys, approved the proposition of settlement and recommended its acceptance by all the stockholders. Mr. Leader, representing 11,000 shares of stock owned by an aged widow, took a very active interest in the matter throughout all the negotiations and was convinced not only that the settlement was for the best interests of his client, but also that any other course would be disastrous for the corporation and all its stockholders.

Mr. Phelan seemingly was the only one who strongly opposed the settlement, although we are moved to say that he was not only conscientious in his convictions, but also indefatigable in his efforts to defeat the compromise. However, as we read the record and briefs, Mr. Phelan's con-

tention and those of the appellants are not so much that the evidence does not support the findings and decision of the trial court upon the issue of settlement, but rather that, in view of the character of the action originally instituted by the appellants and the issues presented thereby, any question of settlement subsequently made had no place in the case and that any consideration thereof by the court rendered the entire proceedings abortive. This brings us to the question of the law governing the controversy.

■ Ordinarily, an action at law or a suit in equity to enforce corporate rights or to redress wrongs done to a corporation cannot be maintained by a stockholder or a group of stockholders. The reason for this is that the cause of action accrues to the corporation itself, and the stockholders' rights therein are merely of a derivative character and therefore can be enforced or asserted only through the corporation. 13 Am. Jur. 504, Corporations, § 461; 18 C. J. S. 1272, Corporations, § 559.

However, where it is shown that the stockholder has exhausted all his available means to obtain within the corporation itself redress of his grievances or the institution of an action in conformity to his wishes, and it appears that the corporation is incapable of enforcing a right of action accruing to it or that its officers or directors are acting fraudulently or collusively among themselves or with others, in such a manner as will result in serious injury to the corporation or to the interests of its stockholders, then, in order to prevent a failure of justice, equity will permit a suit to be brought by a stockholder or stockholders to enforce a right of action belonging to the corporation.

In 4 Pomeroy's Equity Jurisprudence (5th ed.) 277, § 1095, the principle is stated in this language:

"Wherever a cause of action exists primarily in behalf of the corporation against directors, officers, and others, for wrongful dealing with corporate property, or wrongful exercise of corporate franchises, so that the remedy should regularly be obtained through a suit by and in the name of the corporation, and the corporation *either actually or virtually refuses* to institute or prosecute such a suit, then,

in order to prevent a failure of justice, an action may be brought and maintained by a stockholder or stockholders, either individually or suing on behalf of themselves and all others similarly situated, against the wrong-doing directors, officers, and other persons; but it is absolutely indispensable that the corporation itself should be joined as a party,— usually as a co-defendant."

Immediately following the language just quoted appears this explanation of the rationale of the rule:

"The stockholder does not bring such a suit because *his* rights have been *directly* violated, or because the cause of action is *his*, or because *he* is entitled to the relief sought; he is permitted to sue in this manner *simply in order to set in motion the judicial machinery of the court.*"

Accord: *Elliott v. Puget Sound Wood Products Co.*, 52 Wash. 637, 101 Pac. 228; *Tribble v. Missionary Sisters of Sacred Heart,* 137 Wash. 326, 242 Pac. 372.

■ It does not follow from what has been said in this connection, however, that a stockholder or a minority group of stockholders may impose their unbridled wills upon the officers or directors of a corporation by launching the corporation into litigation for the purpose of obtaining for it certain benefits which the complaining parties deem to belong or be due to the corporation. Business policy may dictate that, under certain circumstances, it would be unwise or unprofitable to insist upon one's rights, and accordingly the directors of a corporation or the majority of its stockholders may decline to bring or maintain a suit which a single stockholder or a minority group believes should be instituted.

"The mere fact that a corporation has a cause of action for an injury does not always make it incumbent upon it to sue, any more than in the case of an individual. If, in the opinion of the directors or a majority of the stockholders, the best interests of the company do not require it to sue, it need not do so. The matter ordinarily is within their discretion, and if they act in good faith, their refusal to sue violates no right of dissenting stockholders, so as to entitle them to maintain a suit in their own behalf. The exercise of such discretion by the directors will not be lightly set

aside by the court, and where a stockholder complains of such action of the directors the court will consider the circumstances, and, if no bad faith is shown, will decline to substitute the judgment of the stockholder for that of the managing directors." 13 Fletcher Cyclopedia Corporations (Perm. ed., 1943 Rev. Vol.), 147, § 5822.

This court has itself enunciated that principle, in *Opportunity Christian Church v. Washington Water Power Co.*, 136 Wash. 116, 238 Pac. 641; as has the United States supreme court in *Corbus v. Alaska Treadwell Gold Mining Co.*, 187 U. S. 455, 47 L. Ed. 256, 23 S. Ct. 157.

■ As frequently expressed judicially, a stockholder bringing a derivative action occupies a strictly fiduciary relationship to the corporation whose interests he assumes to represent, and his position in the litigation is in a legal sense the precise equivalent of that of a guardian *ad litem*, while the position of the corporation is the equivalent of the status of a ward or beneficiary.

We emphasize the point, as expressed above, that the particular privilege which, under certain circumstances, is accorded to a single stockholder or to a minority group of stockholders is simply that of setting in motion the judicial machinery, and its sole purpose is to prevent what would otherwise amount to a failure of justice.

■ The mere circumstances that a lone stockholder, or a group of such individuals, has initiated a derivative action, and has alleged the existence of facts entitling him or them to maintain the suit in place of the corporation, do not of themselves establish the propriety of the action or the necessity for its continued maintenance, for otherwise, by this device, the corporation, its officers, and directors, and the majority stockholders would at once be conclusively shorn of their powers of management and discretion in the conduct of those affairs which are of vital concern to the corporation and all its stockholders. The lone stockholder or the stockholders bringing such action not only have the burden of proving the material charges entitling the cor-

poration itself to recover, but they must also establish the grounds entitling them to sue in place of the corporation.

■ Since those who conduct the affairs of the corporation or who have the ultimate power of control over it have the right, in the first instance, to determine whether a suit shall be brought by the corporation or whether an existing controversy shall be compromised without suit, so they also have the right to inquire, consider, and determine whether a suit already brought by a dissentient stockholder is well-founded, what its chances for success may be, and whether in any event its continued maintenance may injuriously affect the present or future prosperity of the corporation. Their right in such matters is not completely forestalled by the mere fact that a single stockholder or a group of stockholders has taken the initiative by instituting a derivative action.

■ Undoubtedly, where the good faith or the freedom of action on the part of the corporation or of its officers, directors, and majority stockholders in compromising and settling a suit previously brought in a derivative capacity, is questioned, the matter becomes one for a court of equity to decide upon all the evidence submitted to it on that issue. The court may approve or it may disapprove the settlement. In either event, it is the action of the court and is binding upon the parties concerned. Nor is the court under such circumstances required first to try out all the issues presented by the plaintiffs in the derivative action; on the contrary, the court may confine itself to the question as to whether the matters involved in such suit have, in good faith and for adequate consideration, been settled and compromised. This, in our opinion, constitutes the orderly manner of procedure, for, otherwise, the fruits of an advantageous settlement might be lost, the corporation exposed to the expense and embarrassment of protracted litigation, and the rights and property of the majority stockholders seriously jeopardized. This view is supported by the recent case of *Denicke v. Anglo California Nat. Bank of San Francisco* (D. C. Cal., 1942), 45 F. Supp. 524, to

which more extended reference will be made a little later herein.

■ Appellants' principal, and almost sole, contention is that, having instituted a derivative action, they had absolute and exclusive control over it, and that their action could not be compromised and settled without their consent or without settling with them. They cite certain cases as authority for the proposition that the plaintiff in a representative action has entire and exclusive control over such action to the last day of the litigation and until the entry of judgment. We do not agree that the proposition as thus broadly stated expresses the true rule. The authorities are generally agreed that, while a plaintiff in a representative action has the right to control the suit and may continue, discontinue, or compromise it at pleasure, his control ceases to be exclusive or absolute when an order is entered making another stockholder a party to the action or when an interlocutory judgment is entered. In 6 Thompson, Corporations (3d ed.), 470, § 4580, it is stated:

"It may be said generally that the suit, having been instituted by a stockholder, continues under his absolute dominion and he has the right to control the suit and may continue, compromise, abandon or discontinue it at pleasure until another stockholder has procured an order to be made a party to the action or until an interlocutory judgment is entered."

In *Grant v. Greene Consolidated Copper Co.*, 169 App. Div. 206, 154 N. Y. Supp. 596, affirmed 223 N. Y. 655, 119 N. E. 1046, we find this statement:

"It has long been settled that in representative actions a sole plaintiff has the right to control the action or to compromise or discontinue it at pleasure, and this continues until some individual with like interest in the cause of action has been admitted as a party, whereupon the exclusive right of the original plaintiff to prosecute, control, or discontinue the action ceases and the cause proceeds in the right and for the benefit of such intervening plaintiff as if he had been an original party."

In the case at bar, there were, in addition to the appellants, three groups of stockholders who filed pleadings,

each asking for relief different from that asked by the others. In that situation appellants did not have absolute and exclusive control of the action. It then became a matter for determination by a court of equity upon considerations of the best interest of the corporation and all its stockholders.

The case most nearly resembling in point of fact the one now before us is that of *Denicke v. Anglo California Nat. Bank of San Francisco, supra,* and, while the reasoning and conclusions in that case are not binding upon us, they are most convincing and coincide with our view of the law to be applied here.

The *Denicke* case was an action brought in the Federal court by minority stockholders of a bank to recover for the defendant bank losses sustained as the result of violations of Federal statutes by the other defendants as officers. The action was instituted after the adoption of the new Federal Rules of Procedure. Rule 23 (c) provides that a representative action shall not be dismissed without the approval of the court.

While that action was pending, the bank entered into an agreement accepting from certain of the defendants their compromise offer to pay the sum of $200,000 in settlement of claims against them estimated at over ten million dollars. The agreement was made pursuant to a resolution adopted at a special stockholders' meeting called for that purpose, but over the objections of several stockholders including the plaintiff who owned 1600 shares. The bank then filed in court a petition for approval of the compromise offer and for termination and dismissal of the pending action. The plaintiff appeared in response to the petition and filed a number of objections. Upon a hearing, the court found that, in recommending the offer of compromise and settlement, the officers of the bank had acted in good faith and for the best interests of the corporation and its shareholders.

The plaintiff's first contention in that case was that he had exclusive control of the litigation until judgment or

until payment of an adequate amount in settlement. In answer to that contention, the court said:

"In this objection plaintiff misconceives the law and the nature of the litigation. In instituting suit he acts as a trustee, for the benefit of defendant bank and its stockholders, to redress corporate injuries. The remedy sought is equitable in character. Plaintiff has no personal wrong for which he is entitled to seek redress. 'The stockholder does not bring such a suit because *his* rights have been *directly* violated, or because the cause of action is *his* or because *he* is entitled to the relief sought. He is permitted to sue in this manner *simply in order to set in motion the judicial machinery of the court.* (3 Pomeroy's Equity, 3d ed. sec. 1095). . . . He is a trustee pure and simple, seeking in the name of another a recovery for wrongs that have been committed against another. His position in the litigation is in every legal sense the precise equivalent of that of guardian ad litem.' After the judicial machinery is set in motion, the control of the litigation is with the court, and the 'action shall not be dismissed or compromised without the approval of the Court.' "

The plaintiff's second contention was that the bank and its officers were without power to compromise the action. In refuting that contention, the court said:

"I know of no legal inhibition against the officers of defendant bank adopting a resolution accepting the offer of compromise subject to the Court's approval. Such action is not binding upon plaintiff because of his special status [stockholder bringing a secondary action] discussed above. Nor is it binding upon the Court, but, depending upon circumstances such as shown here, may be persuasive."

The plaintiff's third contention was that the consideration received by the bank was grossly inadequate when compared with the amount of liability and the sum which could be collected from the defendants in the event of judgment. In answer to that contention, the court pointed out that the officers of the bank had given much time and thought to a settlement of the litigation in which the bank was involved, and after careful investigation and consideration had reached the conclusion that it was for the best interests of the bank and its shareholders to accept

the offer of compromise. The court placed its stamp of approval on the settlement by quoting from *Karasik v. Pacific Eastern Corp.*, 21 Del. Ch. 81, 180 Atl. 604, 609, as follows:

"It is one thing to assert a claim and other thing to prove the claim to judgment. Furthermore, it is one thing to obtain a judgment, and quite another thing to collect it. Figures, however imposing, should not compel practical considerations to yield place to visions."

The concluding paragraph of the *Denicke* case reads as follows:

"The objections to the petition are without merit, further discussion of them is unnecessary, and they will be over-ruled. Defendant bank and its officers acted in good faith and for the best interests of the bank and its shareholders in recommending the acceptance of the offer of compromise and settlement. The petition will be granted."

But for one or two other matters yet to be considered, we might well here conclude this opinion with a statement similar to the concluding paragraph in the *Denicke* case. The evidence in the case and the findings of the trial court would fully support such a conclusion.

Appellants argue throughout their brief that neither the directors nor the stockholders of a corporation may, after a derivative action has been commenced, ratify and approve the fraud complained of in the action. This case does not present a situation of that kind. The directors and stockholders did not ratify or approve any former fraud, even if it be assumed that such had been committed. What the present directors and stockholders did was, after care-ful investigation and study, and for a valuable considera-tion, to compromise and settle a cause of action which the corporation *might* possibly have had against certain de-fendants.

Finally, appellants contend that the court erred in refusing them the right to introduce proof of the amount of their expenses in prosecuting their derivative action and of the amount and value of the services of their attorney. The decree of the court provided, in effect, that the amount

of expenses and attorney's fee, if any are to be allowed, will be fixed as soon as the remittitur is handed down in this appeal.

Manifestly, the application for such expenses and attorney's fee was premature. Until this litigation is completed and terminated it is impossible to say what property the corporation will recover. Should the decree of the trial court be reversed, then the corporation will as yet have recovered nothing, and under such circumstances appellants' reimbursement and compensation would be dependent upon the outcome of the derivative action to be then prosecuted to its conclusion. On the other hand, unless and until the decree is affirmed it cannot be said finally that the corporation has benefited by the institution and settlement of these legal proceedings. Furthermore, until then, the trial court will not have been in a position to determine whether appellants' efforts have contributed to the benefits realized by the corporation through this litigation. Those are all questions which properly can, and should, be determined after transmission of the remittitur herein.

We find no error in the proceedings before the trial court, and the decree is therefore affirmed.

SIMPSON, C. J., BEALS, JEFFERS, and GRADY, JJ., concur.

February 21, 1944. Petition for rehearing denied.